**Eric B. Swartz, ISB #6396**
**Joy M. Vega, ISB #7887**
**JONES & SWARTZ** PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808
Telephone:  (208) 489-8989
Facsimile:  (208) 489-8988
Email: eric@jonesandswartzlaw.com
        joy@jonesandswartzlaw.com

**Attorneys for Plaintiffs Sharon R. Hammer and James R. Donoval**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHARON R. HAMMER and JAMES R. DONOVAL, husband and wife,<br><br>       Plaintiffs,<br><br>vs.<br><br>CITY OF SUN VALLEY; NILS RIBI, in his individual and official capacity; and DEWAYNE BRISCOE, in his individual and official capacity,<br><br>       Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

  **COME NOW** the Plaintiffs, Sharon R. Hammer and James R. Donoval, by and through their counsel of record, Jones & Swartz PLLC, and for their Complaint against Defendants City of Sun Valley, Nils Ribi, and DeWayne Briscoe complain and allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

  1.  Plaintiffs Sharon R. Hammer and James R. Donoval (collectively "Plaintiffs") seek damages in this civil action against Defendants City of Sun Valley, Nils Ribi, and DeWayne Briscoe (collectively "Defendants") for committing acts under the color of law, which deprived

Plaintiffs of protected rights, privileges, and immunities secured by the United States Constitution, 42 U.S.C. §§ 1983 and 1985, and state law.

2.      Plaintiffs' rights of property and liberty were violated and/or unduly restricted without due process of law.

## JURISDICTION AND VENUE

3.      This action is brought pursuant to 42 U.S.C. § 1983, which furnishes a private cause of action for violations of federal rights committed under the color of law, and the First, Fifth and Fourteenth Amendments to the Constitution of the United States.

4.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) as certain of the controversies arise under the Constitution and laws of the United States, and are brought for the purpose of redressing the deprivation of the Plaintiffs' federally protected civil rights.

5.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the Plaintiffs' claims which arise under Idaho state law and common law.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

7.      Plaintiff Sharon R. Hammer ("Ms. Hammer") has complied with the statutory prerequisites to the commencement of this action by filing an administrative charge of discrimination and retaliation with the Idaho Human Rights Commission ("IHRC"), in concurrent jurisdiction with the Equal Employment Opportunity Commission ("EEOC"), Case Nos. E-0112-241 and 38C-2012-00122, respectively.   Ms. Hammer received her Notice of Administrative Dismissal and Right to Sue from the IHRC on February 5, 2013.  Ms. Hammer received her Notice of Right to Sue from the EEOC (via the Department of Justice, Civil Rights Division) on April 11, 2013.

## PARTIES

8.      At all times relevant hereto, Ms. Hammer resided in either the county of Blaine or the county of Ada, state of Idaho.  Ms. Hammer is the wife of Plaintiff James R. Donoval ("Mr. Donoval").  Ms. Hammer served as the City Administrator of the City of Sun Valley, Idaho, from June 1, 2008 until January 19, 2012.  Ms. Hammer also worked as a paid-on-call firefighter and EMT for the City of Sun Valley during that time.

9.      At all times relevant hereto, Mr. Donoval resided in either the county of Blaine or the county of Ada, state of Idaho.  Mr. Donoval is the husband of Ms. Hammer.  Mr. Donoval is an attorney, licensed to practice law before all courts of the State of Idaho.

10.      Defendant City of Sun Valley ("City" or "Defendant City") is a municipal corporation and political subdivision of the State of Idaho.  As a body politic and corporate, the City has the power to sue and be sued.  The City may be held to compensate for actions that implement, execute, or violate a policy statement, resolution, ordinance, regulation, or decision officially adopted and promulgated by its officials, each of whom may be acting in good faith.

11.      Defendant DeWayne Briscoe ("Defendant Briscoe") is the current elected Mayor of the City, having been sworn into office on January 3, 2012.  Prior to becoming Mayor of the City, Defendant Briscoe was an elected member of the Sun Valley City Council ("City Council") beginning in January 2008.  Defendant Briscoe was the elected Council President of the City Council beginning in or about January 2010 until January 3, 2012.  Some or all of the alleged acts and/or omissions engaged in by Defendant Briscoe were done outside of the course and scope of his employment and with malice or reckless disregard for Plaintiffs' protected rights.

12.      At all times relevant hereto, Defendant Nils Ribi ("Defendant Ribi") has been an elected City Council Member.  Defendant Ribi's first term on the City Council began in or about

January 2006 through January 2010.  Defendant Ribi's current term on the City Council began on or about January 5, 2010, and will end in January 2014.  Some or all of the alleged acts and/or omissions engaged in by Defendant Ribi were done outside of the course and scope of his employment with the City and with malice or reckless disregard for Plaintiffs' protected rights.

## FACTUAL ALLEGATIONS

### Other Relevant City Actors

13.     At all times relevant hereto, but ending on January 3, 2012, Wayne Willich ("Mayor Willich") acted as the elected Mayor of the City.  Mayor Willich's term as Mayor ended on or about January 3, 2012, when Mayor Briscoe was sworn into office.

14.     Robert Youngman ("Councilman Youngman") is the current elected Council President of the City Council, having been sworn into office on January 3, 2012.  Councilman Youngman was first sworn in as a City Council Member in or about January 2010.

15.     At all times relevant hereto, Adam King ("City Attorney King") was employed by the City as the City Attorney.

16.     At all times relevant hereto, Kelly Ek ("City Clerk Ek") was employed by the City as the Sun Valley City Clerk.  City Clerk Ek resigned her position as Sun Valley City Clerk in or about June 2012.

17.     At all times relevant hereto, Michelle Frostenson ("City Treasurer Frostenson") was employed by the City as the Sun Valley Finance Manager/Treasurer.  City Treasurer Frostenson resigned her position as the City of Sun Valley Finance Manager/Treasurer in or about June 2012.

18.     Franz Suhadolnik ("Councilman Suhadolnik") is currently an elected City Council Member.  Councilman Suhadolnik's current term began on January 3, 2012, and will

end in January 2016.  This current term is his first term as a City Council Member.

19.     Michelle Griffith ("Councilwoman Griffith") is currently an elected City Council Member.  Councilwoman Griffith's term began on January 3, 2012, and will end in January 2016.  This current term is her first term as a City Council Member.

20.     At all times relevant hereto, but ending on January 3, 2012, Joan Lamb ("Councilwoman Lamb") acted as an elected City Council Member.  Councilwoman Lamb's former term as a City Council Member ended on or about January 3, 2012.

21.     At all times relevant hereto, but ending in January 2010, David Chase ("Councilman Chase") acted as an elected City Council Member.  Councilman Chase's former term as a City Council Member ended in or about early January 2010.

22.     Kirtlan G. Naylor ("Attorney Naylor") was retained in or about November 2011 by the City's insurer, Idaho Counties Risk Management Program ("ICRMP"), to defend the City against the November 21, 2011 lawsuit filed by Ms. Hammer, Blaine County District Court Case No. CV-2011-928.  Attorney Naylor was also retained by ICRMP to defend the City against Ms. Hammer's December 15, 2011 charge of discrimination and retaliation before the IHRC.

23.     Patricia Latham Ball, by or through Management Northwest ("Investigator Ball"), was retained by the City in or about November 2011 to perform an independent investigation into allegations of misconduct against Ms. Hammer, Defendant Ribi, and other City officials.

### Applicable Idaho Statutes, City Policies, and Official Roles of Certain City Representatives

24.     At all times relevant hereto, Defendant City utilized an organization plan, or form of government, commonly known as the Mayor-Council Plan.  Defendant City does not utilize the organization plan known as the Council-Manager Plan.

25.     On or about January 16, 1997, the City adopted its Personnel Policies and

COMPLAINT AND DEMAND FOR JURY TRIAL – 5

Procedures Manual ("Personnel Manual"), which has been amended from time to time.  At all times relevant hereto, the version of the Personnel Manual adopted by "Resolution No. 2007-12 March 15, 2007" has been the applicable Personnel Manual version, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).

26.     No changes were made to the Personnel Manual by any act of the City Council from June 1, 2008 through January 19, 2012.

27.     The Personnel Manual is an official policy and/or permanent record of the City.

28.     In or about December 2008, the City adopted the City of Sun Valley Municipal Government City Council and Mayor Powers and Authorities ("P & A Manual").  At all times relevant hereto, the version of the P & A Manual adopted by "Amended Resolution 2010-02 May 20, 2010" has been the applicable P & A Manual version, a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).

29.     The P & A Manual is an official policy and/or permanent record of the City.

30.     In or about December 2008, the City adopted the City of Sun Valley City Council and Mayor Code of Ethics and Code of Conduct ("Code of Ethics").  At all times relevant hereto, the version of the Code of Ethics adopted by "Amended Resolution 2010-04 May 20, 2010" has been the applicable Code of Ethics version, a true and correct copy of which is attached hereto as Exhibit 3 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).

31.     The Code of Ethics is an official policy and/or permanent record of the City.

32.     Idaho Code § 50-602 provides:  "The mayor ... shall be the chief administrative

official of the city, preside over the meetings of the city council and determine the order of business subject to such rules as the council may prescribe, ... have the superintending control of all the officers and affairs of the city, preserve order, and take care that the ordinances of the city and provisions of this act are complied with and enforced."

33.     Idaho Code § 50-607 provides: "The mayor shall have and exercise such powers, prerogatives and authority as is conferred by the laws of the state of Idaho or as may be conferred upon him by the city council, and shall have the power to administer oaths, and shall sign all contracts and conveyances in the name of and on behalf of the city."

34.     Pursuant to Section 3.1 of the Personnel Manual:  "The appointment and discharge of the City Administrator, City Clerk, City Treasurer and City Attorney shall be made by the Mayor and approved by the majority of the City Council.  All other personnel shall be appointed or discharged by the City Administrator."  (Ex. 1.)

35.     During his term as Mayor, Wayne Willich was the chief administrative official of the City, and held and exercised final authority over all affairs of the City and all acts or omissions of the City Administrator, the City Clerk, the City Finance Director/Treasurer, and the City Attorney.

36.     During his term as Mayor, Defendant Briscoe has been the chief administrative official of the City, holding and exercising final authority over all affairs of the City and all acts or omissions of the City Administrator, the City Clerk, the City Finance Director/Treasurer, and the City Attorney.

37.     As a result of the City's national search of candidates, Ms. Hammer was appointed to the position of City Administrator by Mayor Willich following the unanimous vote of Defendants Briscoe and Ribi, Councilwoman Lamb, and Councilman Chase.

38.     On or about June 1, 2008, the terms and conditions of Ms. Hammer's employment with the City were set forth in the City Administrator Employment Agreement, a true and correct copy of which is attached hereto as Exhibit 4 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).

39.     On or about September 17, 2009, the terms and conditions of Ms. Hammer's employment with the City were extended as set forth in the City Administrator Employment Agreement Extension, a true and correct copy of which is attached hereto as Exhibit 5 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).

40.     Pursuant to Section 10.A of Ms. Hammer's employment contracts: "The Mayor, in consultation with the Employee, shall fix such other terms and conditions of employment, as he may determine from time to time to be appropriate, relating to the performance of Employee, provided such terms and conditions are not inconsistent with or in conflict with the provisions of this Agreement."  (Exs. 4 and 5.)

41.     Pursuant to Section 1.5 of the Personnel Manual, Ms. Hammer's contract supersedes the Personnel Manual in the event of conflicting terms:  "The City may enter into written employment agreements with any Employee.   The provisions of any employment agreement shall supersede this Manual in the event of conflict."  (Ex. 1, § 1.5.)

42.     Pursuant to his authority, Mayor Willich authorized Ms. Hammer to use a 2001 Ford Expedition owned by the City for any and all purposes, including for personal use.

43.     Pursuant to his authority, Mayor Willich authorized Ms. Hammer to use and charge amounts to a City credit card for any and all gasoline purchases related to the 2001 Ford Expedition.

44.     Pursuant to his authority, Mayor Willich authorized Ms. Hammer to take

compensatory time off during a normal, Monday through Friday, 40-hour business week without using accrued vacation time, in order to offset the substantial non-regular work hours Ms. Hammer committed to the City between her positions of City Administrator and City firefighter and EMT.

45.     Pursuant to Section 3.2 of the Personnel Manual, Ms. Hammer, as City Administrator, was directly supervised and evaluated by the sitting Mayor.  From June 1, 2008 until January 3, 2012, Ms. Hammer was directly supervised by Mayor Willich.  From January 3, 2012 until January 19, 2012, Ms. Hammer was directly supervised by Defendant Briscoe.

46.     Pursuant to Section 2.1.A of the Personnel Manual, Ms. Hammer, as City Administrator, had the responsibility to provide interpretation and advice to City department heads and supervisory staff concerning the application of the Personnel Manual.  (Ex. 1.)  And, Ms. Hammer held the authority to "make the final determination of questions of interpretations of these policies and the application of these policies."  (Ex. 1.)

47.     Pursuant to Section 3.2 of the Personnel Manual, Ms. Hammer, as City Administrator, had the authority to directly supervise and evaluate all City personnel, other than the City Attorney, but including the City Clerk and the City Treasurer.  (Ex. 1.)

48.     However, Ms. Hammer did not supervise City Treasurer Frostenson when it came to City Treasurer Frostenson's statutory duty to prepare and report, under oath, to the City Council (not to Ms. Hammer or Mayor Willich) that all expenditures of the City were legitimate.  Such expenditures included employee payroll and credit card expenses.  It was then the City Council's duty to authorize or not authorize each expenditure reported by City Treasurer Frostenson.

49.     Ms. Hammer did supervise City Treasurer Frostenson regarding City activities

related to the budget, financial statements, non-payroll employee benefits, and other duties of City Treasurer Frostenson as set forth in her job description.

50.    Idaho Code § 50-208 sets forth the statutory duties of a city treasurer, including: "The treasurer of each city shall be the custodian of all moneys belonging to the city; he shall keep a separate account of each fund or appropriation, and the debits and credits belonging thereto; ... he shall at the end of each and every month and as often as may be required, render an account to the city council, under oath, showing the state of the treasury at the date of such account and the balance of money in the treasury; he shall also accompany such accounts with a statement of all receipts and disbursements, together with all warrants redeemed and paid by him, which said warrants, with any and all vouchers held by him, shall be filed with his said account in the clerk's office, ... ."

51.    The City created and adopted a written job description for its Finance Manager/ Treasurer, a true and correct copy of which is attached hereto as Exhibit 6 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).   At all times relevant hereto, such written job description, the Personnel Manual, and the statutory requirements of the position dictated the duties of City Treasurer Frostenson.

52.    At all times relevant hereto, City Treasurer Frostenson was mandated to appear on at least a monthly basis before the City Council and certify, under oath, that all financial transactions of the City, including payroll and credit card transactions, were true and correct and supported by all necessary documentation required for the City Council's approval of all such expenditures.

53.    In or about December 2005, the City created and adopted a written Credit Card Policy, a true and correct copy of which is attached hereto as Exhibit 7 and incorporated herein

by reference pursuant to Federal Rule of Civil Procedure 10(c).  Pursuant to Section B of the Credit Card Policy:  "The Finance Manager is responsible for administration of the credit cards to include:  selection of card provider, payment of credit card bills, managing the issuance of credit cards, and ensuring proper use."

54.     At all times relevant hereto, the City Council held and exercised the final authority to approve any and all expenditures of the City, as presented under oath by City Treasurer Frostenson.

55.     Idaho Code § 50-207 sets forth the statutory duties of a city clerk, including: "The city clerk shall keep a correct journal of the proceedings of the council and shall have the custody of all laws and ordinances of the city ... .  He shall also perform such other duties as may be required by ordinance."

56.     The City created and adopted a written job description for its City Clerk, a true and correct copy of which is attached hereto as Exhibit 8 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).  At all times relevant hereto, such written job description, the Personnel Manual, and the statutory requirements of the position dictated the duties of City Clerk Ek.

57.     Pursuant to Idaho Code § 50-602 and Section 3.2 of the Personnel Manual, City Attorney King was directly supervised and evaluated only by the Mayor.

58.     Pursuant to Idaho Code § 50-208A and Section 2.1.B of the Personnel Manual, City Attorney King was the legal advisor to the City, and was charged with providing "professional legal advice and services to the City Administrator and Mayor on matters related to the [Personnel Manual]."  (Ex. 1.)

59.     The authorities and powers of the City Council are set forth within Idaho Code

Title 50 Chapter 7, the Personnel Manual, the P & A Manual, and the Code of Ethics.

60.     Neither the City Council nor any individual City Council Member has any authority or power to act on behalf of the City outside of the dictates of Idaho Code Title 50 Chapter 7, the Personnel Manual, the P & A Manual, and the Code of Ethics.

61.     The primary roles of the City Council are to approve the appointment and/or discharge of certain City employees upon the recommendation of the Mayor, and enact or modify ordinances, policies, and procedures of the City.

62.     Neither the City Council nor any individual City Council Member has any authority over the day-to-day administration or operations of the City.  Neither the City Council nor any individual City Council Member has any authority to direct a City employee in the administration of that employee's duties.

63.     No City employee is directly supervised by the City Council or any City Council Member.  No City employee's job performance is evaluated by the City Council or any City Council Member.

64.     City Council Members have no authority to seek or take disciplinary action against any City employee.

65.     No City employee is allowed to provide confidential records to the City Council or any Council Member without approval from either the Mayor or the City Administrator.

66.     Within the Personnel Manual, the City expressly adopted a harassment policy that prohibited "harassment in any form, including verbal, physical and visual harassment" either "by or against any of its Employees."  (Ex. 1, § 7.5.)

67.     Pursuant to the Personnel Manual, when an employee believes that he or she has been harassed "by a co-worker, Supervisor, any City official, or individual outside of the City

organization," the anti-harassment guidelines of the Personnel Manual instruct the employee to "immediately notify his/her Department Head of the facts of the incident or incidents and the name(s) of the individual(s) involved."  (Ex. 1, § 7.5, Guidelines A.)  Further, if the complaint is against "a member of the City Council, the Employee should report the complaint to the Mayor." (Ex. 1, § 7.5, Guidelines B.)

68.     The Personnel Manual further prohibits retaliation against a person "for filing a harassment charge or making a harassment complaint."  (Ex. 1, § 7.5, Guidelines G.)

<u>**Summary of Reported Harassment, Discrimination, and Retaliation Against Ms. Hammer and Violations of the Personnel Policies and Procedures Manual**</u>

69.     Throughout her employment by the City, Ms. Hammer was repeatedly and continuously harassed, physically and emotionally intimidated, verbally abused, and assaulted by Defendant Ribi.

70.     Ms. Hammer repeatedly reported such incidents of harassment, intimidation, and abuse, as well as her fears regarding her personal safety, to Mayor Willich, City Attorney King, and/or City Police Chief Cam Daggett.

71.     In retaliation for Ms. Hammer's complaints against him, Defendant Ribi sought confidential employment documents from other City employees, including at least City Clerk Ek and City Treasurer Frostenson, in order to create the appearance of misconduct by Ms. Hammer.

72.     City Clerk Ek and City Treasurer Frostenson distributed confidential documents regarding or relating to Ms. Hammer to, at least, Defendant Ribi and City Attorney King.

73.     In response to pressures from and allegations of misconduct alleged by Defendants Ribi and Briscoe, Councilman Youngman, and City Attorney King, which were allegedly supported by confidential employment documents supplied by City Clerk Ek and City

Treasurer Frostenson, Mayor Willich, following a unanimous vote by Defendants Ribi and Briscoe, Councilman Youngman, and Councilwoman Lamb, placed Ms. Hammer on administrative leave pending an independent internal investigation.

74.     Following the conclusion of the City's internal investigation in late December 2011, Mayor Willich found Ms. Hammer to have done no wrong.  Mayor Willich requested that Ms. Hammer return to work immediately.  Mayor Willich's decision was final and binding.

75.     Following his swearing in as City Mayor in January 2012, Defendant Briscoe re-placed Ms. Hammer on administrative leave.  A few weeks later, on January 19, 2012, Defendant Briscoe, following the unanimous vote by Defendant Ribi, Councilman Youngman, Councilman Suhadolnik, and Councilwoman Griffith, terminated Ms. Hammer from her position as City Administrator pursuant to the "without cause" terms of her employment contract.

76.     Upon information and belief, Ms. Hammer was twice put on administrative leave and then fired in response to ongoing retaliation and pressures from Defendants Ribi and Briscoe, Councilman Youngman, and City Attorney King.

77.     Ms. Hammer suffered adverse actions when she was investigated, placed on administrative leave, and then fired.

78.     Ms. Hammer suffered emotional distress and economic losses when she was placed on administrative leave and then fired.

79.     After Ms. Hammer was fired from her position as City Administrator, the Defendants engaged in a concerted campaign of harassment and defamation against her.

80.     Some of Defendants' actions occurred within the scope of their policymaking authority and therefore constitute policies or customs of local government units for purposes of determining liability pursuant to 42 U.S.C. § 1983.

COMPLAINT AND DEMAND FOR JURY TRIAL – 14

81.     Some or all of the alleged acts and/or omissions engaged in by Defendants Ribi and Briscoe were done outside of the course and scope of their employment with the City and with malice or with reckless disregard for Ms. Hammer's and Mr. Donoval's protected rights.

<u>**Events of Harassment and Discrimination**</u>
<u>**Against Ms. Hammer by Defendant Ribi**</u>

82.     In or about the fall of 2008 through spring of 2009, Ms. Hammer worked with Mayor Willich in the development and/or amendment of certain written policies pertaining to City finances and City Council operations, including but not limited to the budget policy, fund balance policy, revenue and expenditure policy, investment policy, debt management policy, the P & A Manual, and the Code of Ethics.  Defendant Willich presented such policies to the City Council for review and adoption.

83.     During the development of such policies, Ms. Hammer was repeatedly contacted by Defendant Ribi, both telephonically and in person, regarding specific language he demanded be included in or deleted from the draft policies.  Ms. Hammer told Defendant Ribi that those discussions were to be held with the entire City Council at a public City Council meeting, and that any changes Defendant Ribi was seeking needed to be approved by vote of the entire City Council.

84.     During each such confrontation, Defendant Ribi became hostile toward Ms. Hammer.  In response to his aggression, Ms. Hammer directed Defendant Ribi to discuss the issues with Mayor Willich.

85.     After each such confrontation, Ms. Hammer discussed Defendant Ribi's improper hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did discuss the same with Defendant Ribi.

86.     On or about April 16, 2009, a City Council meeting was held.  During said meeting, Mayor Willich publicly stated words to the effect that City Council Members have no authority to direct any City employee, including Ms. Hammer, to do anything.  Mayor Willich further stated that City Council Members should instead direct all inquiries and requests to Mayor Willich himself.

87.     On or about May 14, 2009, a City Council meeting was held.  Prior to that meeting, Ms. Hammer was repeatedly contacted by Defendant Ribi, both telephonically and in person, regarding what the City Council Priorities should be.  He contacted her about the issue before those priorities were presented for discussion and approval by the City Council.

88.     During those communications, Defendant Ribi demanded that Ms. Hammer make changes to the language of the proposed City Council Priorities.  During each confrontation, Ms. Hammer told Defendant Ribi that his requests were to be discussed with the entire City Council at a public City Council meeting, and that any changes he was seeking needed to be agreed upon by the entire City Council.  Defendant Ribi became angry and hostile toward Ms. Hammer.  In response to his aggressions, Ms. Hammer directed Defendant Ribi to discuss the issues with Mayor Willich.

89.     Ms. Hammer thereafter discussed Defendant Ribi's hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

90.     On or about July 9, 2009, a City Council meeting was held.  Prior to that meeting, Ms. Hammer was repeatedly contacted by Defendant Ribi, both telephonically and in person, regarding the Amtrak Service Resolution that was to be discussed by the City Council at the July 9th meeting.  During those communications, Defendant Ribi demanded that Ms. Hammer

COMPLAINT AND DEMAND FOR JURY TRIAL – 16

make changes to the language of the proposed <u>Amtrak Service Resolution</u>.

91.     During each confrontation, Ms. Hammer told Defendant Ribi that his requests had to be discussed with the entire City Council at a public City Council meeting and that any changes he was seeking needed to be agreed upon by the entire City Council.  Defendant Ribi became angry and acted with aggression toward Ms. Hammer.   In response, Ms. Hammer directed Defendant Ribi to discuss the issues with Mayor Willich.

92.     Ms. Hammer thereafter discussed Defendant Ribi's angry and aggressive conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the angry and aggressive conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did discuss the same with Defendant Ribi.

93.     On or about January 21, 2010, a City Council meeting was held.  Prior to that meeting, Ms. Hammer was contacted by Defendant Ribi on several occasions, both telephonically and in person, regarding the language that he demanded be included in the <u>P & A Manual</u> and the <u>Code of Ethics</u> being discussed by the City Council.  Ms. Hammer endeavored to work with Defendant Ribi in a cordial manner, despite the issues that had arisen with his behavior.

94.     During each such confrontation, Ms. Hammer told Defendant Ribi that those discussions were to be held with the entire City Council at a public City Council meeting and that any changes he was seeking needed to be made by the entire City Council.  Defendant Ribi became angry and acted with aggression toward Ms. Hammer.   In response, Ms. Hammer directed Defendant Ribi to discuss the issues with Mayor Willich.

95.     Ms. Hammer thereafter discussed Defendant Ribi's angry and aggressive conduct toward her with Mayor Willich.  At this time, Ms. Hammer specifically discussed with Mayor

Willich that Defendant Ribi's anger and hostility toward her was becoming a pattern of conduct. Ms. Hammer again described her repeated experiences of perceived verbal and visual abuse. Ms. Hammer and Mayor Willich discussed that Defendant Ribi's violent conduct seemed to result from Ms. Hammer refusing Defendant Ribi's requests and therefore prohibiting him from getting what he wanted.  Mayor Willich told Ms. Hammer that he would discuss this violent conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did discuss the same with Defendant Ribi.

96.     During the January 21, 2010 City Council meeting, Mayor Willich publicly reminded the City Council Members, and in particular Defendant Ribi, that City Council Members should contact him directly, not City personnel, regarding all City matters.

97.     Continuing through January 2010 until about the end of May 2010, Defendant Ribi continued to contact Ms. Hammer, both telephonically and in person, and repeatedly demanded that she make modifications to the language of the P & A Manual and the Code of Ethics that was still being discussed by the City Council.

98.     On each occasion, Ms. Hammer reminded Defendant Ribi of Mayor Willich's direction that City Council Members were to discuss such matters with Mayor Willich only, and not City employees.  On each occasion, Defendant Ribi became angry and acted with hostility toward Ms. Hammer.  In response to said confrontations, Ms. Hammer directed Defendant Ribi to discuss the issues with Mayor Willich.

99.     In each instance, Ms. Hammer thereafter discussed Defendant Ribi's hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the angry and hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

COMPLAINT AND DEMAND FOR JURY TRIAL – 18

100.     On or about March 23, 2010, a City Council meeting was held.  Prior to that meeting, Defendant Ribi contacted Ms. Hammer, both telephonically and in person, regarding changes that he demanded be included in the Comprehensive Audited Financial Report being prepared by City staff.

101.     During such confrontations, Ms. Hammer told Defendant Ribi that he had no authority to make or request any changes to the audited financial statements, which had been prepared by independent auditors and were part of the Comprehensive Audited Financial Report. Ms. Hammer also told Defendant Ribi that the remainder of the Comprehensive Audited Financial Report was the responsibility of City staff, and not the City Council.  Defendant Ribi became angry and acted with aggression toward Ms. Hammer.   In response, Ms. Hammer directed Defendant Ribi to discuss the issues with Mayor Willich.

102.     Ms. Hammer thereafter discussed Defendant Ribi's improper angry and aggressive conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the angry conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

103.     During the March 23, 2010 City Council meeting, Defendant Ribi angrily and in a hostile manner pounded with his fists on the table in front of him regarding his disagreement with  Ms. Hammer  on  issues  surrounding  the  Comprehensive Audited Financial Report. Defendant Ribi's physical actions were directed at Ms. Hammer and his disagreement was with her.

104.     Also during the March 23, 2010 meeting, Ms. Hammer spoke with City Attorney King, who was sitting next to her, about the inappropriate and frightening actions of Defendant Ribi.   City  Attorney  King  stated  to  Ms. Hammer  that  Defendant  Ribi's  conduct  was

inappropriate and unacceptable.  After the meeting, Ms. Hammer further discussed Defendant Ribi's physical aggression and visual and verbal abuses toward her with Mayor Willich and City Attorney King.  Ms. Hammer also specifically addressed her concerns about Defendant Ribi's emotional and mental wellbeing, and her growing concerns about her physical safety around Defendant Ribi.  Mayor Willich told Ms. Hammer that he would discuss the improper conduct with Defendant Ribi and, on information and belief, Mayor Willich did do so.

105.    On or about May 20, 2010, a City Council meeting was held.  During that meeting, Mayor Willich again publicly told all City Council Members that they were not to verbally abuse or interrogate any of the City's employees.

106.    On or about June 3, 2010, a City Council meeting was held.  Prior to that meeting, Ms. Hammer was contacted by Defendant Ribi, both telephonically and in person, regarding the Property Tax Levy Policy that was being discussed by the City Council.

107.    During those communications, Defendant Ribi demanded that Ms. Hammer make changes to language in the proposed Property Tax Levy Policy.  Ms. Hammer told Defendant Ribi that those discussions were to be held with the entire City Council at a public City Council meeting and that any changes he was seeking had to be made by the entire City Council. Defendant Ribi became angry and hostile toward Ms. Hammer.  In response to such confrontations, Ms. Hammer directed him to discuss the issue with Mayor Willich.

108.    Ms. Hammer thereafter discussed Defendant Ribi's angry and hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the improper hostile conduct with Defendant Ribi and, upon information and belief, he did do so.

109.    On or about June 28, 2010, the City Council passed a Tentative Budget for Fiscal Year 2011 ("Tentative 2011 Budget").

110.    A day or two following the City Council's passage of the Tentative 2011 Budget, City Treasurer Frostenson discovered that she had made a math error in the calculation of the total amount of the Tentative 2011 Budget.  Without notice to anyone, including Ms. Hammer, City Treasurer Frostenson corrected the math error.  The corrected amount was not presented to the City Council for further approval.  The corrected Tentative 2011 Budget was approximately $200,000 less than what had been approved by the City Council.  The corrected Tentative 2011 Budget was published by the City in the *Idaho Mountain Express* newspaper.

111.    Defendant Ribi saw the corrected Tentative 2011 Budget when it was published in the *Idaho Mountain Express*.  After his review of the newspaper publication, Defendant Ribi called Ms. Hammer at City Hall.  He was very upset and agitated toward Ms. Hammer.  He immediately began berating her for the change in the corrected Tentative 2011 Budget as published in the *Idaho Mountain Express* newspaper.

112.    Ms. Hammer attempted to discuss the matter with Defendant Ribi and offered several options for publicly resolving all of his concerns about the issue.  Defendant Ribi yelled at Ms. Hammer, shouting words to the effect that she had no right to change the amount of the Tentative 2011 Budget after it had been approved by the City Council.

113.    Ms. Hammer suggested that Defendant Ribi speak with Mayor Willich so that they could decide the best way to proceed on the issue.  Defendant Ribi became increasingly angry, abusive and hostile, and continued to berate Ms. Hammer in a threatening manner.

114.    Ms. Hammer was frightened by the tone and threatening manner of Defendant Ribi's voice and words.  She told Defendant Ribi that he had no right to speak to her in that manner and that she was going to hang up the telephone, which she did.

115.    Ms. Hammer immediately contacted Mayor Willich and described the incident to

him.   She specifically told Mayor Willich that she had become seriously concerned about Defendant Ribi's volatile emotional state and about his inability to control his anger and aggression toward her.   Ms. Hammer also told Mayor Willich that she was becoming increasingly fearful of her physical safety when Defendant Ribi was near her.   Mayor Willich told Ms. Hammer that he would discuss Defendant Ribi's behavior with him.   Upon information and belief, Mayor Willich did do so.

116.   In or about the summer of 2010, Ms. Hammer, Mayor Willich, and City Attorney King met and discussed the multiple events of hostile and abusive conduct by Defendant Ribi toward Ms. Hammer.

117.   City Attorney King told Ms. Hammer that he had conducted legal research on the issue and decided that, because Defendant Ribi was an elected official, there was nothing that could be done to discipline him.   City Attorney King stated that if Defendant Ribi were a City employee, Mayor Willich would have cause to fire him for his harassing and hostile conduct. City Attorney King advised Ms. Hammer and Mayor Willich that the only thing to be done was for Mayor Willich to continue to advise Defendant Ribi to refrain from acting in a harassing, abusive and hostile manner toward Ms. Hammer, and advised Mayor Willich that he could better control the City Council meetings.

118.   In or about August through September of 2010, the City was negotiating a marketing contract with Sun Valley Marketing Alliance.

119.   Several times during that timeframe, Ms. Hammer was contacted by Defendant Ribi, both telephonically and in person, regarding the language of the draft marketing contract. During those communications, Defendant Ribi demanded that Ms. Hammer make changes to the language of the proposed marketing contract.   His demanded changes had not been discussed

with, or approved by, either Mayor Willich or the City Council.

120.   Ms. Hammer told Defendant Ribi that his desired changes to the draft marketing contract had to be discussed with Mayor Willich and the entire City Council at a public City Council meeting.  Ms. Hammer further advised Defendant Ribi that any changes he was seeking needed to be made by the entire City Council.

121.   Defendant Ribi became angry and hostile toward Ms. Hammer.  In response to his demands and harassing conduct, Ms. Hammer directed Defendant Ribi to discuss the issue with Mayor Willich.   Ms. Hammer thereafter discussed Defendant Ribi's improper and hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

122.   On or about September 30, 2010, the City was presented with a Certificate of Achievement for Excellence in Financial Reporting by the Government Finance Officers Association of the United States and Canada ("GFOA") for the City's comprehensive annual financial report.

123.   On or about October 1, 2010, the City received GFOA's Distinguished Budget Presentation Award for the City's fiscal 2009-10 budget.  Ms. Hammer was presented with a Certificate of Recognition for Budget Presentation as the individual who was primarily responsible for the City having achieved the Award.

124.   On or about October 21, 2010, a City Council meeting was held.  Prior to that meeting, Defendant Ribi contacted Ms. Hammer, both telephonically and in person, regarding a contract for audit services that the City was negotiating with Eide Bailly, LLP.  During those communications, Defendant Ribi demanded that Ms. Hammer make changes to the language of the proposed contract for audit services.  His demanded changes had not been discussed with or

approved by either Mayor Willich or the City Council.

125.     Ms. Hammer told Defendant Ribi that his proposed changes had to be discussed with Mayor Willich and the entire City Council at a public City Council meeting.  Ms. Hammer further advised Defendant Ribi that any changes he was seeking needed to be made by the entire City Council.

126.     Defendant Ribi became angry and hostile toward Ms. Hammer because she refused to succumb to his demands regarding the contract for audit services.  In response to his demands and hostile behavior, Ms. Hammer directed Defendant Ribi to discuss the issue with Mayor Willich.  Ms. Hammer thereafter discussed Defendant Ribi's hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

127.     On or about November 18, 2010, a City Council meeting was held.  Prior to that meeting, Defendant Ribi repeatedly contacted Ms. Hammer, both telephonically and in person, regarding the External Contract Policy that was being discussed by the City Council.  During those communications, Defendant Ribi demanded that Ms. Hammer make changes to the language of the proposed External Contract Policy.  Defendant Ribi's requested changes had not been discussed with or approved by Mayor Willich or the City Council.

128.     In response to his demands, Ms. Hammer told Defendant Ribi that his demands had to be presented to the entire City Council at a public City Council meeting.  She also told Defendant Ribi that any changes he was seeking needed to be made by the entire City Council. Defendant Ribi became angry and hostile toward Ms. Hammer for not acquiescing to his demands.

129.     In response to the onset of anger from Defendant Ribi, Ms. Hammer directed him

COMPLAINT AND DEMAND FOR JURY TRIAL – 24

to discuss the issue with Mayor Willich.  Ms. Hammer thereafter discussed Defendant Ribi's improper conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the improper conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

130.    On or about March 17, 2011, a City Council meeting was held.  Prior to that meeting, Defendant Ribi repeatedly contacted Ms. Hammer, both by telephone and in person, regarding several issues that were to be discussed at the March 17, 2011 City Council meeting, including but not limited to the City's Management Responses to the independent auditors' Management Report, funding of consolidated dispatch services, and allowing City Council Members to have input in establishing City Council meeting agenda items.  Defendant Ribi demanded that Ms. Hammer make changes to the language of the Management Responses to the Management Report.

131.    During one such in-person confrontation, Ms. Hammer told Defendant Ribi that any issues related to funding of consolidated dispatch services and establishing City Council meeting agenda items needed to be discussed either directly with Mayor Willich or publicly with the entire City Council at the March 17, 2011 meeting.  Ms. Hammer also told Defendant Ribi that she would not make changes to the Management Responses to the Management Report without direction from Mayor Willich.

132.    When Ms. Hammer refused to fulfill his demands, Defendant Ribi became very agitated and began pacing nervously in Ms. Hammer's office, shaking his hands in the air and saying in an agitated voice:  "No, no, no!  You don't understand!"  Ms. Hammer was shaken by Defendant Ribi's conduct.  Eventually, Ms. Hammer was able to defuse the situation and get Defendant Ribi to leave her office.

COMPLAINT AND DEMAND FOR JURY TRIAL – 25

133.    After the incident in her office, Ms. Hammer again discussed Defendant Ribi's physically hostile and verbally abusive conduct toward her and her growing fear of him with Mayor Willich and City Attorney King.  Mayor Willich told Ms. Hammer that he would discuss the conduct with Defendant Ribi and, upon information and belief, Mayor Willich did do so. City Attorney King again advised Ms. Hammer that no disciplinary action could be taken against Defendant Ribi because he was an elected official.

134.    In or about late 2010 through early 2011, Ms. Hammer spent substantial amounts of time working with the City's external engineering firm, CH2M HILL, and Mayor Willich preparing a detailed long-term Capital Improvement Plan ("CIP").

135.    On or about April 7, 2011, a City Council meeting was held.  Prior to that meeting, Ms. Hammer was contacted by Defendant Ribi, telephonically and in person, regarding multiple issues related to the draft CIP that was being submitted to the City Council for review and approval at the upcoming meeting.

136.    During one of the in-person confrontations, Defendant Ribi insisted that it was unnecessary for an engineer from CH2M HILL to be present at all subsequent CIP meetings. Ms. Hammer attempted to explain to Defendant Ribi that the engineer from CH2M HILL had developed the extensive spreadsheets incorporated into the CIP, that Ms. Hammer was unfamiliar with the details of the CIP spreadsheets, and that it was important for the CH2M HILL engineer to be personally present to make any changes in the CIP requested by the City Council.  During that confrontation, Defendant Ribi refused to let Ms. Hammer speak and repeatedly said:  "No, no, no – you don't understand!"

137.    Also during that confrontation, Defendant Ribi demanded that Ms. Hammer make substantive changes to capital project items that were included in the draft CIP, herself, without

any input from or approval of either Mayor Willich or the City Council.  Again, Ms. Hammer told Defendant Ribi that he had to discuss his proposed changes with either Mayor Willich or the entire City Council at the upcoming April 7, 2011 public City Council meeting.  Ms. Hammer also told Defendant Ribi that all of the changes he was seeking regarding capital projects in the CIP needed to be made by the entire City Council.

138.    In addition to the substantive changes he wanted Ms. Hammer to unilaterally make to the CIP, Defendant Ribi was also adamant that multiple non-substantive modifications to the CIP, such as column sizes, colors and descriptions, be made.

139.    When Ms. Hammer refused to make the substantive and non-substantive changes to the CIP as demanded by Defendant Ribi, he became livid and yelled at her.  Defendant Ribi told Ms. Hammer that she worked for the City Council.  Ms. Hammer responded that she took direction from the Mayor, and that she could not do as Defendant Ribi was insisting.  Defendant Ribi yelled back at Ms. Hammer stating that Mayor Willich did not know what his job was.  Defendant Ribi's tirade continued to the point that Ms. Hammer became concerned that he would also become physically violent toward her.

140.    Throughout Defendant Ribi's violent outburst, Ms. Hammer did her best to defuse the situation.  Eventually, she was able to get out of her office, away from Defendant Ribi, and walked to a different part of the Sun Valley City Hall.

141.    Ms. Hammer thereafter again met with Mayor Willich and City Attorney King, at which time she again expressed her concerns about Defendant Ribi's emotional wellbeing and his continuing harassment and abuse of her.  Mayor Willich told Ms. Hammer that he would discuss the improper hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

142.    On or about April 21, 2011, a City Council meeting was held.  At that meeting, Mayor Willich again publicly warned the City Council that he would not tolerate any City Council Member directing any City employee on the logistics of how to do his or her job. Mayor Willich also stated that City employees do not work for the City Council or any of its individual members.  Mayor Willich explained that, by law, all City employees work for him, as the Mayor, not for the City Council.

143.    Following Mayor Willich's instruction and warning during the April 21, 2011 City Council meeting, Defendant Ribi continued contacting Ms. Hammer directly and instructing her what to do in her job.

144.    On or about May 1, 2011, the City received GFOA's Distinguished Budget Presentation Award for the City's fiscal 2010-11 budget.  Ms. Hammer was presented with a Certificate of Recognition for Budget Presentation as the individual who was primarily responsible for the City having achieved the Award.

145.    In or about May of 2011, Ms. Hammer met with City Attorney King to discuss her ongoing complaints and concerns about Defendant Ribi.  City Attorney King advised Ms. Hammer that, based upon legal research he had conducted, because Defendant Ribi was an elected official, not a City employee, no disciplinary action could be taken against him.

146.    In or about June of 2011, Defendant Ribi told Ms. Hammer in a telephone call that he wanted her to be responsible for maintaining the City's website.  Shortly thereafter, Defendant Ribi confronted Ms. Hammer in person, blocking the doorway of her office in the City Hall.  He stated that Ms. Hammer should be working on the City's website.  Ms. Hammer told Defendant Ribi that David Blampied, the Sun Valley Administrative Assistant, was responsible for keeping the City's website up to date.  Defendant Ribi became very angry.  He

raised his hands in the air and began shaking them, shouting: "No, no, no!  You don't understand!"

147.     Defendant Ribi said that David Blampied did not know how to keep the Sun Valley website up to date.  Ms. Hammer told Defendant Ribi that she knew nothing about maintaining a website and suggested that he speak to Mayor Willich about the issue.  Defendant Ribi then became more agitated and very angrily said words to the effect that Mayor Willich did not know how to do his job.

148.     Eventually, Defendant Ribi left Ms. Hammer's office.  Ms. Hammer thereafter met with Mayor Willich and discussed Defendant Ribi's demands that she be in charge of the City's website.  They again discussed Ms. Hammer's concerns about Defendant Ribi's hostile conduct toward her.  Mayor Willich told Ms. Hammer that he would discuss the issues of the City's website and Defendant Ribi's hostile conduct with him.  Upon information and belief, Mayor Willich did do so.

149.     On or about July 20, 2011, a City Council meeting was held.  Prior to that meeting, Defendant Ribi repeatedly contacted Ms. Hammer, both telephonically and personally at City Hall, regarding a contract with Cox Cable that the City was negotiating.

150.     During those communications, Defendant Ribi demanded that Ms. Hammer spend substantial amounts of time researching cable service contracts of other similar municipalities.  Ms. Hammer told Defendant Ribi that she took direction from Mayor Willich, not from him.  And, Ms. Hammer told him that she would speak to Mayor Willich about his request to expand research related to the Cox Cable contract.

151.     Defendant Ribi became angry and argumentative with Ms. Hammer.  He angrily said words to the effect that Mayor Willich did not know what his job was.  Ms. Hammer

thereafter discussed Defendant Ribi's hostile conduct toward her with Mayor Willich.  Mayor Willich told Ms. Hammer that he would discuss the improper hostile conduct with Defendant Ribi.  Upon information and belief, Mayor Willich did do so.

152.    Upon information and belief, or about August 2, 2011, Mayor Willich met with City Attorney King at City Attorney King's office in Ketchum, Idaho.  The two met specifically to discuss Defendant Ribi's harassment and abuse of Ms. Hammer, as well as Defendant Ribi's mistreatment of several other City employees.

153.    Upon information and belief, after the August 2, 2011 meeting with Mayor Willich, City Attorney King, without authority from either Ms. Hammer or Mayor Willich, discussed in detail the harassment complaints and concerns about Defendant Ribi's conduct with Defendant Ribi.  City Attorney King never disclosed to Ms. Hammer or Mayor Willich that he had thereafter spoken with Defendant Ribi regarding the complaints against Defendant Ribi.

154.    On or about September 15, 2011, a City Council meeting was held.  During the meeting, discussion was held regarding acceptable methods for modifying budgeted line items.

155.    During a break, Ms. Hammer was trying to explain to Defendant Ribi the generally accepted accounting practices and procedures for modifying municipal budgets.  Defendant Ribi became very agitated and continuously interrupted Ms. Hammer to tell her how he wanted the particular procedure done.  Defendant Ribi's proposed budgeting procedure contravened the generally accepted accounting practices for municipal governments.

156.    Every time Ms. Hammer tried to speak to Defendant Ribi about the correct budgeting procedures, he would cut her off, raise his arms in the air and begin waiving his hands, saying angrily:  "You don't understand!"  As the conversation continued, Defendant Ribi became more and more enraged.

157.    Eventually, Ms. Hammer told Defendant Ribi that she was going to discuss the matter with Mayor Willich.  At that point, Defendant Ribi raised his arms, turned toward Ms. Hammer, and in a physically threatening manner yelled:  "No! You will not talk to the Mayor!"

158.    In reaction to Defendant Ribi's physically and verbally violent outburst, Ms. Hammer's heart began racing, she became alarmed, immediately stepped back and away from Defendant Ribi, and stated:  "Whoa!"  As a result of Defendant Ribi's physical actions and yelling directed at her, Ms. Hammer was fearful of harmful or offensive contact with her body by Defendant Ribi.

159.    Ms. Hammer then turned away from Defendant Ribi and walked down the hallway of City Hall and back into the City Council Chamber where Mayor Willich, several City Council Members and several City staff were present.  Defendant Ribi followed Ms. Hammer down the hallway and into the Sun Valley City Council Chamber, and acted as if nothing had happened.

160.    This incident was witnessed by former City employee David Blampied.  Upon information and belief, several other City employees either witnessed Defendant Ribi's assault of Ms. Hammer or heard some or all of the altercation.

161.    Immediately following the City Council meeting on September 15, 2011, Ms. Hammer held separate meetings with Mayor Willich, City Attorney King, and Sun Valley Police Chief Cam Daggett.   During each meeting, Ms. Hammer described the physical altercation by Defendant Ribi.  Ms. Hammer also expressed her concern over Defendant Ribi's increasingly agitated, erratic and threatening behavior, and sought advice on how to respond to Defendant Ribi.  Police Chief Daggett suggested that Ms. Hammer shut and lock her door when

she knew Defendant Ribi to be at City Hall.  He also suggested that Ms. Hammer consider recording her conversations with Defendant Ribi.  In turn, City Attorney King agreed that Police Chief Daggett's suggestions were appropriate.

162.   Upon information and belief, Mayor Willich spoke with Defendant Ribi and directed him to not act with aggression toward Ms. Hammer.  Upon information and belief, Mayor Willich instructed Defendant Ribi to come to him with any request that Defendant Ribi would have otherwise sought from Ms. Hammer or any other City employee.

163.   Subsequent to the September 15, 2011 City Council meeting, Mr. Donoval met in person with City Attorney King.  Mr. Donoval stated his concerns about Ms. Hammer's safety when Defendant Ribi was near her.  City Attorney King acknowledged to Mr. Donoval that Mayor Willich and Ms. Hammer had, on several occasions, discussed the issue of Defendant Ribi's harassment and hostility toward Ms. Hammer.  City Attorney King reiterated his legal opinion to Mr. Donoval, that there was nothing the City or Mayor Willich could do to discipline or terminate Defendant Ribi, because he was an elected official.

164.   During their meeting, Mr. Donoval suggested that Ms. Hammer's complaints against Defendant Ribi be documented in Defendant Ribi's personnel file.  Alternatively, Mr. Donoval suggested to City Attorney King that Ms. Hammer's complaints against Defendant Ribi be raised as an agenda item at an upcoming City Council meeting.  City Attorney King told Mr. Donoval that he would discuss both options with Mayor Willich and Ms. Hammer, but he also warned Mr. Donoval that either option would be considered to be a "political act" against Defendant Ribi.

165.   On or about November 3, 2011, Ms. Hammer was presented with the Certificate of Achievement for Excellence in Financial Reporting by the Government Finance Officers

Association of the United States and Canada for the City's comprehensive annual financial report.  The Certificate of Achievement is the highest form of recognition in the area of governmental accounting and financial reporting, and its attainment represents a significant accomplishment by a government and its management.

### Events of Association Causing Harassment, Discrimination, and Retaliation Against Ms. Hammer and Mr. Donoval

166.    During the course of Ms. Hammer's employment, Mr. Donoval and Mayor Willich became personal friends, in part due to their mutual upbringing in Chicago and their mutual affiliation with the Republican Party.

167.    Regardless of his personal friendship with Mayor Willich, but because of his marriage to Ms. Hammer, Mr. Donoval refrained from any involvement in matters related to the governance, operation, or politics of the City.

168.    Defendant Ribi is a known Democrat.

169.    Upon information and belief, Mayor Willich had several disagreements with Defendant Ribi regarding Mayor Willich's operation of the City and Ms. Hammer's numerous complaints to Mayor Willich related to Defendant Ribi's misconduct.

170.    During the course of Ms. Hammer's employment, Defendant Ribi acted solely in his personal interest, without the objective impartiality required of a City Council Member, and with hostility toward Ms. Hammer and Mr. Donoval due to Mr. Donoval's political affiliations and personal friendship with Mayor Willich.

171.    In or about the summer of 2010, Mr. Donoval ran as a Republican candidate for the Idaho State Senate legislator position for the district that encompasses the City.

172.    During the election campaign period, Defendant Ribi publicly endorsed Mr. Donoval's opponent.

173.     After Defendant Ribi made such public endorsement of the Democratic candidate, Mr. Donoval sent Defendant Ribi an email wherein Mr. Donoval expressed his opinion that Defendant Ribi's public endorsement was improper due to Defendant Ribi's position as an elected official of the City.

174.     In said email, Mr. Donoval told Defendant Ribi that due to Ms. Hammer's position as City Administrator, Mr. Donoval was ethically prohibited from participating in any election related to the City.  In turn, Mr. Donoval expressed his opinion that Defendant Ribi was, likewise, ethically prohibited from getting involved in Mr. Donoval's election.

175.     Thereafter, Defendant Ribi acted solely in his personal interest, without the objective impartiality required of a City Council Member and with hostility toward Ms. Hammer and Mr. Donoval due to Mr. Donoval's association with the Republican Party and because of Mr. Donoval's criticism of Defendant Ribi for publicly endorsing Mr. Donoval's opponent.

176.     In or about the fall of 2011, Defendant Briscoe announced his candidacy for Mayor of the City.  Defendant Briscoe ran against incumbent Mayor Willich.

177.     In or about the fall of 2011, Defendant Ribi publicly endorsed Defendant Briscoe in his election campaign for Mayor of the City.

178.     The election for Mayor of the City occurred on November 8, 2011, and Defendant Briscoe won the election.

### Events of Harassment and Retaliation Against Ms. Hammer by Defendants Through the End of Mayor Willich's Term

179.     In or about November 2011, motivated by personal and political interests, Defendant Ribi sought and received confidential documents relating to Ms. Hammer from City Clerk Ek and City Treasurer Frostenson, in an attempt to create the appearance of financial misconduct.

180.    In or about November 2011, City Clerk Ek and City Treasurer Frostenson distributed confidential documents, including personnel records, payroll records, and other documents, regarding or relating to Ms. Hammer to, at least, Defendant Ribi and City Attorney King, in violation of the Personnel Manual.  (Ex. 1, §§ 3.3, 7.4.)

181.    Upon information and belief, in or about November 2011, Defendant Ribi and City Attorney King had numerous communications with City Treasurer Frostenson and City Clerk Ek regarding employment documents and other matters relating to Ms. Hammer and Mayor Willich.

182.    In one email exchange, City Attorney King called City Clerk Ek a "hero."  And, City Attorney King and/or Defendant Ribi told City Clerk Ek that she "would be protected, and thanked emphatically for coming forward and 'doing the right thing.'"

183.    Upon information and belief, City Attorney King and/or Defendant Ribi also told City Treasurer Frostenson that she would be treated the same way as City Clerk Ek, and rewarded for providing any documents, information, or testimony related to Ms. Hammer that could be used to create the appearance of misconduct by Ms. Hammer.

184.    In or about June 2012, City Clerk Ek was paid $72,000 by the City's insurer for settlement of the allegations stated in her April 20, 2012 notice of tort claim to the City.

185.    In or about June 2012, City Treasurer Frostenson was paid more than $84,000 by the City's insurer for settlement of the allegations stated in her notice of tort claim to the City.

186.    Upon information and belief, immediately following the November 8, 2011 election, Defendant Ribi and City Attorney King further distributed the ill-gotten, allegedly accusatory confidential employment materials regarding Ms. Hammer to Defendant Briscoe and Councilman Youngman, and the men utilized said materials during communications between and

among each other to craft a plan for Ms. Hammer's termination.

187.    On or about November 10, 2011, prompted by Defendant Ribi, Defendants Ribi and Briscoe and Councilman Youngman called for a Special Executive Session of the City Council to be held on November 11, 2011.  On or about November 11, 2011, a Special Executive Session was held.  Upon information and belief, Defendants Ribi and Briscoe, Councilman Youngman, City Attorney King, Mayor Willich, and City Treasurer Frostenson attended the Executive Session.

188.    Upon information and belief, during the November 11, 2011 meeting, City Treasurer Frostenson presented the unsupported, ill-gotten, and/or allegedly accusatory confidential employment documents and other information regarding Ms. Hammer to Defendants Ribi and Briscoe, Mayor Willich, and Councilman Youngman for the purpose of alleging financial misconduct by Ms. Hammer.

189.    Upon information and belief, the allegations of financial misconduct against Ms. Hammer as presented at the November 11, 2011 meeting related to purported misuse of the City's 2001 Ford Expedition and City credit card(s), purported unauthorized compensatory time off of work, and other vague allegations of financial improprieties.

190.    Upon information and belief, at the end of the November 11, 2011 meeting, and based on the legal advice of City Attorney King, Defendants Ribi and Briscoe and Councilman Youngman demanded that Mayor Willich either terminate Ms. Hammer's employment or force her to resign.

191.    Following the November 11, 2011 meeting, Mayor Willich and City Attorney King confronted Ms. Hammer in her office at City Hall.  Mayor Willich told Ms. Hammer that she had been generically accused of theft, fraud, and embezzlement.  City Attorney King told

Ms. Hammer that the City was considering pursuing criminal charges against her.   Mayor Willich then told Ms. Hammer that he had been directed by Defendants Ribi and Briscoe and Councilman Youngman, based upon City Attorney King's legal advice, to seek Ms. Hammer's immediate resignation.

192.   After being informed of the accusations, Ms. Hammer requested that Mayor Willich and/or City Attorney King provide her with specific descriptions of the accusations against her and any information that supported such accusations.   Neither Mayor Willich nor City Attorney King ever provided Ms. Hammer with such information.

193.   Ms. Hammer also requested that she be provided an opportunity to confront both City Treasurer Frostenson and the City Council regarding the allegations against her, and to rebut any and all such allegations.   Ms. Hammer was never allowed such opportunities.

194.   At the end of the November 11, 2011 meeting between Ms. Hammer, Mayor Willich and City Attorney King, she advised them that she would not resign.

195.   Mayor Willich then told Ms. Hammer that he, personally, did not believe the allegations, and that he felt it was a "witch hunt" against her, especially given the fact that City Treasurer Frostenson, the City Council, and he had approved many, if not all, of the acts that purportedly constituted misconduct by Ms. Hammer.

196.   The City never provided Ms. Hammer with any written allegations of misconduct against her.   Nor did the City ever disclose to Ms. Hammer any evidence in support of any claims of misconduct against her.   Ms. Hammer was never allowed to address the City Council regarding said allegations.

197.   On or about November 13, 2011, Mr. Donoval, acting as Ms. Hammer's legal counsel, provided written notice to the City and its elected officials of the ongoing harassment of

Ms. Hammer by Defendant Ribi, which had culminated in the November 11, 2011 Special Executive Session and Defendants Ribi and Briscoe and Councilman Youngman's attempt to force her resignation, supported by the concerted acts of City Clerk Ek, City Treasurer Frostenson, and City Attorney King.  The notice demanded that Ms. Hammer be allowed to face the City Council regarding the allegations against her.  The notice also requested that City Attorney King recuse himself from any further proceedings regarding Ms. Hammer.  City Attorney King disregarded the request for recusal.

198.    On or about November 14, 2011, the City Council held a continuation of the November 11, 2011 Special Executive Session.  Upon information and belief, the November 14, 2011 Special Executive Session was attended by Defendants Ribi and Briscoe, Councilman Youngman, City Attorney King, Mayor Willich, and City Treasurer Frostenson.

199.    Upon information and belief, during the November 14, 2011 Executive Session, Defendant Briscoe and Councilman Youngman voted in favor of an internal investigation, to be conducted by an independent investigator, into the alleged accusations of wrongdoing by Ms. Hammer.  Upon information and belief, Defendant Ribi voted against an internal investigation being conducted and continued to demand Ms. Hammer's immediate termination. Following the November 14, 2011 Executive Session, Mayor Willich announced that the City Council had directed him to conduct an independent fact-finding investigation into the allegations of misconduct against Ms. Hammer.

200.    On or about November 16, 2011, Mr. Donoval, acting as Ms. Hammer's legal counsel, delivered a second written notice to the City and its elected officials, asserting that the allegations of misconduct by Defendant Ribi were motivated solely because of Ms. Hammer's ongoing allegations of harassment and discrimination against Defendant Ribi.  The notice also

advised that if the City continued in its investigation of Ms. Hammer, she would file an immediate retaliation lawsuit against the City and Defendant Ribi.   The letter reiterated Ms. Hammer's and Mr. Donoval's concerns for Ms. Hammer's safety in light of Defendant Ribi's apparent mental health and emotional stability issues.   The letter again requested that Ms. Hammer be allowed to meet directly with the City Council over the allegations.

201.   On or about November 18, 2011, Ms. Hammer was provided with written notice, prepared by City Attorney King and signed by Mayor Willich, that she was being placed on administrative leave from her positions as City Administrator, firefighter, and EMT.

202.   Ms. Hammer requested but was not provided with any written explanation regarding the reason(s) for being placed on administrative leave.

203.   The written notice stated:  "This is not a disciplinary action."

204.   Mayor Willich told Ms. Hammer that she was being put on administrative leave in order to protect her from Defendant Ribi, and to avoid any appearance of impropriety during the investigation.

205.   Contrarily, Defendant Ribi, as a City Council Member, made written public statements, under penalty of perjury, that:

> [T]he Mayor and Council had reason to believe that [Ms. Hammer] may have committed serious misconduct, including possible criminal violations of statutes dealing with the misuse of public funds and falsification of public records by [Ms. Hammer]. Because the Plaintiff, in the position of City Administrator, has unfettered access to the records of the City of Sun Valley, including records which may be essential to a determination of whether or not improprieties, misconduct and/or criminal action have been committed by the Plaintiff, it was and is essential that she be placed on administrative leave and ordered not to be in Sun Valley City hall [sic] until appropriate investigative measures have been completed.

(November 23, 2011 Affidavit of Nils Ribi in Opposition to Motion for Temporary Restraining

Order, ¶ 10, filed in the District Court of the Fifth Judicial District of the State of Idaho, in and for the County of Blaine, Case No. CV-11-928.)  Some or all of Defendant Ribi's statement was also quoted in the *Idaho Mountain Express* newspaper.

206.    On or about November 18, 2011, Mr. Donoval filed a public records request with the City, seeking certain banking, payroll and other non-confidential City records.  City Attorney King denied the public records request.

207.    At all times following the City's receipt of Mr. Donoval's November 18, 2011 public records request, the Defendants, all City Council Members, City Attorney King, Investigator Ball, and Attorney Naylor were aware of the public records request.

208.    As a result of the City's denial of the public records request, Mr. Donoval filed a lawsuit against the City in the Blaine County District Court on December 12, 2011 ("Public Records Case"), seeking the production of all previously requested public records.  On or about March 6, 2012, the presiding judge ordered the City to produce the checking account records previously requested by Mr. Donoval.

209.    At all times following service upon the City in the Public Records Case, the Defendants, all City Council Members, City Attorney King, Investigator Ball, and Attorney Naylor were aware of the Public Records Case.

210.    On or about November 21, 2011, Ms. Hammer, through Mr. Donoval acting as her attorney, filed a complaint in the Blaine County District Court under the statutory protections of the Idaho Protection of Public Employee's Act ("IPPEA Case"), and named as defendants the City, Defendant Ribi, and City Attorney King, and was later amended to add Councilman Youngman.

211.    After filing the IPPEA Case, Defendant Ribi was quoted in the *Idaho Mountain*

*Express* newspaper as effectively stating that Mr. Donoval was not credible (in his legal representation of Ms. Hammer) because Mr. Donoval had lost the Idaho State Senate election in November 2010.

212.    On or about December 15, 2011, Ms. Hammer filed a complaint against the City with the Idaho Human Rights Commission, citing events of discrimination and retaliation against her in violation of both state and federal law ("IHRC Complaint").

213.    In or about November 2011, Attorney Naylor was retained by ICRMP to defend the City and the named City representatives in the IPPEA Case, and also the IHRC Complaint once it was filed by Ms. Hammer.  Attorney Naylor was to take instruction from and report directly to Mayor Willich alone (during the remainder of his term).

214.    During the remainder of his term, Mayor Willich provided Attorney Naylor with no authority or duties other than to defend the City against Ms. Hammer's IPPEA Case and IHRC Complaint – except that he was authorized to receive the same information that Mayor Willich, Defendant Briscoe and City Attorney King would ultimately receive from Investigator Ball.

215.    At all times following the City's receipt of the IPPEA Case and the IHRC Complaint, the Defendants, all City Council Members, City Attorney King, Investigator Ball, and Attorney Naylor were aware of the filings.

216.    Following the filings of the IPPEA Case and IHRC Complaint, Defendants Ribi and Briscoe, City Treasurer Frostenson, Attorney Naylor, and other City representatives continued harassing Ms. Hammer by making statements that the City would file criminal charges against her.  On November 29, 2011, Defendant Ribi's personal attorney in the IPPEA Case represented to the Court that:  "[E]ven as we speak, there is an investigator in Blaine County

looking into these allegations.  …  So the investigator is there looking into allegations of misappropriation, misconduct.  Those could be or may not be criminal violations as such."

217.    On or about November 23, 2011, Mayor Willich entered into a written retainer agreement with Investigator Ball ("Ball Retainer Agreement"), a true and correct copy of which is attached hereto as Exhibit 9 and incorporated herein by reference pursuant to Federal Rule of Civil Procedure 10(c).

218.    Pursuant to the terms of the Ball Retainer Agreement, Investigator Ball's scope of authority was originally limited to conducting a "fact-finding investigation" related to the allegations of misconduct against Ms. Hammer, and later expanded to include Ms. Hammer's allegations against Defendant Ribi.

219.    Pursuant to the terms of the Ball Retainer Agreement, Investigator Ball's scope of authority did not include rendering opinions related to the fact-finding investigation, or interpreting operative Idaho law, the Personnel Manual, the P & A Manual, or the Code of Ethics.

220.    Pursuant to the terms of the Ball Retainer Agreement, Investigator Ball was to receive instruction from and report directly to Mayor Willich.  Investigator Ball was also authorized to communicate with Defendant Briscoe and City Attorney King regarding the internal investigation.

221.    Subsequent to entering into the Ball Retainer Agreement, Mayor Willich expanded the scope of the investigation to include fact-finding related to Ms. Hammer's claims of harassment and assault by Defendant Ribi.

222.    On or about December 12, 2011, Investigator Ball completed her written report in the internal investigation ("Authorized Ball Report") and presented it to Mayor Willich.

223.     Contrary to her limited scope of fact-finding authority, the Authorized Ball Report contained unauthorized interpretations of the Personnel Manual and conclusory opinions regarding the findings of fact obtained by Investigator Ball during the investigation.   The unauthorized interpretations and conclusions made by Investigator Ball were within Mayor Willich's exclusive determinative authority pursuant to Idaho Code § 50-602 and Section 8.7 of the Personnel Manual.

224.     Investigator Ball's final communications with Mayor Willich regarding the City's internal investigation occurred on December 13, 2011.   On that day, Mayor Willich told Investigator Ball that her assignment was complete and that her services to the City had come to an end.

225.     Following Mayor Willich's receipt and review of the Authorized Ball Report, Mayor Willich did not request or authorize Investigator Ball to do any additional work under the Ball Retainer Agreement or on behalf of the City.

226.     On or before December 13, 2011, the City's internal investigation was concluded.

227.     Due to the sensitive personnel issues contained within the Authorized Ball Report, Mayor Willich allowed only the current City Council Members, Attorney Naylor, and City Attorney King – but no one else – the opportunity to review the Authorized Ball Report at the offices of City Attorney King.

228.     Mayor Willich determined that the Authorized Ball Report was complete as to the allegations against Ms. Hammer.   Mayor Willich further determined that the Authorized Ball Report was incomplete and flawed as to the allegations asserted by Ms. Hammer against Defendant Ribi.

229.     Mayor Willich also determined that no allegation asserted by City Treasurer

Frostenson or Defendant Ribi against Ms. Hammer required further disciplinary investigation or action because each allegation was covered by some specific authorization that Mayor Willich had given to Ms. Hammer, and/or was a transaction that had been approved by City Treasurer Frostenson and the City Council.

230.    Based on the Authorized Ball Report, Mayor Willich advised Ms. Hammer that he had determined that the report contained insufficient material to warrant Ms. Hammer remaining on administrative leave.  Mayor Willich further advised Ms. Hammer that the report contained several inconsistencies that led him to question the entire report.  Finally, Mayor Willich stated to Ms. Hammer that he determined the matter to be closed.

231.    On December 23, 2011, Mayor Willich requested that Ms. Hammer return to work on December 27, 2011, and assume her normal duties as City Administrator, firefighter and EMT.

232.    On or about December 27, 2011, Ms. Hammer returned to her normal duties as City Administrator, with all rights and responsibilities of that office.  Ms. Hammer also returned to work in her capacity as a City firefighter and EMT.

233.    On or about December 28, 2011, Mayor Willich completed Ms. Hammer's annual employee performance evaluation and assigned the highest rate available for each category of evaluation.

### Events of Unauthorized Investigatory Activities by Defendants Ribi and Briscoe in Concert with Other City Representatives

234.    Subsequent to retaining Investigator Ball, Mayor Willich agreed that Attorney Naylor could receive copies of Investigator Ball's reports related to the internal investigation. Mayor Willich also agreed that Attorney Naylor could be updated by Mayor Willich, Defendant Briscoe, or City Attorney King regarding the status of Investigator Ball's investigation.

235.    Upon information and belief, Mayor Willich never granted Attorney Naylor the authority to communicate directly with Investigator Ball, to direct Investigator Ball in her independent investigation, or to otherwise be involved in the internal investigation.

236.    Beginning on or about November 24, 2011 through at least January 3, 2012, Attorney Naylor did communicate directly with Investigator Ball, on an almost daily basis, regarding or relating to the internal investigation.

237.    All such communications between Attorney Naylor and Investigator Ball occurred without the inclusion or knowledge of Mayor Willich.  Ultimately, Mayor Willich learned of the extensive discussions between Attorney Naylor and Investigator Ball, and discussed the same with Attorney Naylor.

238.    Thereafter, and without any authority from Mayor Willich or any amendment to the Ball Retainer Agreement, Investigator Ball stopped reporting to Mayor Willich and instead began reporting directly to Attorney Naylor.

239.    Upon information and belief, when Investigator Ball stopped reporting to Mayor Willich and instead began reporting directly to Attorney Naylor, she also began reporting to Defendants Briscoe and Ribi.

240.    Upon information and belief, subsequent to the commencement of the internal investigation, Defendants Ribi and Briscoe agreed with Investigator Ball, Attorney Naylor, and City Attorney King, without Mayor Willich's knowledge or authority, to alter the scope of Investigator Ball's limited fact-finding authority to include purposefully proving the allegations of misconduct against Ms. Hammer and the innocence of Defendant Ribi.

241.    Following completion of the internal investigation and presentation to Mayor Willich of the Authorized Ball Report, Investigator Ball prepared a different written report

related to her internal investigation, dated December 20, 2011 ("Unauthorized Ball Report"). The Unauthorized Ball Report contained additional unauthorized interpretations of the Personnel Manual and conclusory opinions regarding the findings of fact obtained by Investigator Ball during the internal investigation.

242.    The Unauthorized Ball Report was never discussed with or provided to Mayor Willich by Investigator Ball.

243.    Upon information and belief, the Unauthorized Ball Report was drafted at the direction of Defendants Ribi and Briscoe and Attorney Naylor.

244.    Upon information and belief, one purpose of the Unauthorized Ball Report was to provide the appearance of proof for the allegations of misconduct against Ms. Hammer in order to publicly destroy her personal and professional reputations, in retaliation for Ms. Hammer having made complaints of misconduct against Defendant Ribi.

245.    Another purpose of the Unauthorized Ball Report was to provide the appearance of proof for the allegations of misconduct against Ms. Hammer in order to publicly destroy her personal and professional reputations, in retaliation for Ms. Hammer filing the IPPEA Case and the IHRC Complaint.

246.    Another purpose of the Unauthorized Ball Report was to provide the appearance of proof for the allegations of misconduct against Ms. Hammer in order to publicly destroy her personal and professional reputations, in retaliation against both Ms. Hammer and Mr. Donoval due to Mr. Donoval filing his November 18, 2011 public records request and Mr. Donoval's December 12, 2011 Public Records Case.

247.    Investigator Ball never interviewed Ms. Hammer regarding the purported findings of fact that led to Investigator Ball's interpretations and conclusions in the Unauthorized Ball

Report.  Ms. Hammer was never given the opportunity to correct any factual errors or provide rebuttal evidence to the statements contained in either the Authorized Ball Report or the Unauthorized Ball Report.

248.    Upon information and belief, the Unauthorized Ball Report was prepared by Investigator Ball with the knowledge that Defendants Ribi and Briscoe and Attorney Naylor intended to provide it to the Blaine County Prosecutor and/or other investigatory contractors, as part of a scheme to seek criminal prosecution of Ms. Hammer.

249.    The scheme to seek the criminal prosecution of Ms. Hammer was in retaliation for Ms. Hammer's public disclosure of Defendant Ribi's harassment and discrimination against her; for filing the IPPEA Case and the IHRC Complaint; and for Mr. Donoval filing his public records request and the Public Records Case.

250.    Sometime between November 18, 2011 and December 27, 2011, Attorney Naylor removed, or had removed to his possession, original personnel records of multiple City employees from Ms. Hammer's City Hall office, including Ms. Hammer's own original personnel file, without the approval of Mayor Willich or Ms. Hammer.

251.    As a result of such personnel files being impermissibly removed from City Hall, the documents and information contained therein, including exculpatory materials related to the allegations of misconduct against Ms. Hammer, were not provided to or considered by Investigator Ball or any other investigatory contractor.

252.    Upon information and belief, documents from multiple City employees' personnel files have been removed from such files.

253.    On or about December 27, 2011, Mayor Willich demanded that Attorney Naylor return all of the original City employee personnel files to Ms. Hammer at City Hall.

254.    Attorney Naylor returned Ms. Hammer's original personnel file, but refused Mayor Willich's directive to return the other original City employee personnel files before Mayor Willich's term ended.

### Events of Continuing Harassment and Retaliation Against Ms. Hammer by Defendants Subsequent to Defendant Briscoe Becoming Mayor

255.    On or about January 3, 2012, Defendant Briscoe was sworn into office as the Mayor of the City of Sun Valley.

256.    On January 4, 2012, Defendant Briscoe placed Ms. Hammer back on administrative leave.  Defendant Briscoe's written notice of leave stated that "we have received information indicating that you may have acted, omitted acts, or otherwise performed in ways which are contrary to the expectations of the standards of conduct for the City of Sun Valley employees."

257.    Ms. Hammer was provided with no explanation regarding the reasons for being re-placed on administrative leave.  The City never provided Ms. Hammer with any evidence in support of any claim of misconduct against her.

258.    Between January 4, 2012 and January 19, 2012, Ms. Hammer, through Mr. Donoval as her attorney, delivered written demands to the City that Ms. Hammer be provided with a written statement of all charges of misconduct against her, that she be given copies of any evidence of such misconduct, and that she be given the opportunity to refute such allegations at a hearing before the City Council.

259.    The City ignored and refused Ms. Hammer's written requests for information and a hearing.

260.    Following the re-placement of Ms. Hammer on administrative leave, Attorney Naylor continued to make threats, through Mr. Donoval, that Ms. Hammer would be criminally

charged if she did not resign from her position as the City Administrator.

261.    In or about January 2012, Attorney Naylor provided the Unauthorized Ball Report to the Blaine County Prosecutor for referral regarding an independent review as to any potential criminal conduct by Ms. Hammer.

262.    On January 11, 2012, in a public proceeding before the Blaine County District Court in the IPPEA Case, Attorney Naylor publically stated that Ms. Hammer was being investigated for criminal allegations by the Blaine County Prosecutor.  At the time of Attorney Naylor's statement, Blaine County Prosecutor Jim Thomas had not determined that he was going to conduct an investigation of Ms. Hammer.  Blaine County Prosecutor Jim Thomas never told Attorney Naylor that an investigation would be conducted or that Attorney Naylor was authorized to make public statements about Mr. Thomas's intentions.

263.    Following the January 11, 2012 hearing, Attorney Naylor told Mr. Donoval that he would personally make sure that Ms. Hammer was criminally prosecuted and that her professional career ruined.

264.    Thereafter, City representatives made various public statements that Ms. Hammer was under criminal investigation.

265.    On January 19, 2012, following the unanimous vote of Defendant Ribi, Councilmen Youngman and Suhadolnik, and Councilwoman Griffith, Defendant Briscoe terminated Ms. Hammer, purportedly "without cause," from her position as City Administrator.

266.    Upon information and belief, Ms. Hammer was terminated, in part, because of her complaints of harassment and discrimination against Defendant Ribi.

267.    Upon information and belief, Ms. Hammer was terminated, in part, because she had filed the IPPEA Case and the IHRC Complaint.

268.     Upon information and belief, Ms. Hammer was terminated, in part, because of Mr. Donoval's November 18, 2011 public records request and subsequent Public Records Case.

269.     Upon information and belief, Ms. Hammer was terminated, in part, because of the allegations of misconduct against her by City Treasurer Frostenson and Defendant Ribi, as set forth in the Unauthorized Ball Report.

270.     Upon information and belief, Ms. Hammer was terminated, in part, because of the Defendants' animosity toward Mr. Donoval for his affiliation with the Republican Party, his personal friendship with Mayor Willich, and his legal representation of Ms. Hammer.

271.     Ms. Hammer has never been provided with a written explanation from the City or any City representative regarding the reason(s) for her termination.

272.     Ms. Hammer made a written request that the City hold a hearing and afford her due process to defend any allegations of misconduct.

273.     The City ignored this request and refused to hold any sort of hearing regarding or relating to Ms. Hammer's termination.

274.     Within a day or two of Ms. Hammer's termination, Defendant Briscoe prepared and/or authorized the publication of a written announcement regarding Ms. Hammer's termination.  Defendant Briscoe instructed and/or authorized the City to purchase a quarter-page advertisement space in the *Idaho Mountain Express* newspaper, where the press release was published, in the color red.  In the public announcement, the City did not include an express statement that the termination of Ms. Hammer's employment was without cause.  Upon information and belief, the City had never previously published a press release regarding a City employee's termination.

275.     The written press release was also placed on the City's website.  Upon

information and belief, the City had never previously placed a press release regarding the termination of a City employee on its website.

276.    Following Ms. Hammer's termination, Defendant Briscoe prepared and/or authorized the publication of at least two additional press releases by the City regarding or relating to allegations of misconduct and/or harassment of other City employees by Ms. Hammer.   The press releases implied that Ms. Hammer was guilty of the alleged misconduct.

277.    Defendant Briscoe instructed and/or authorized the City to purchase advertisement space in the *Idaho Mountain Express* newspaper, where the additional press releases were published.

278.    In or about early February 2012, Defendant Briscoe announced that the City would be contracting for the performance of an independent forensic audit of the City's operations during Ms. Hammer's tenure as City Administrator ("Forensic Audit").   The City hired the firm of Hagen, Streiff, Newton & Oshiro, Accountants, PC, to perform the Forensic Audit ("Forensic Auditor").

279.    Upon information and belief, the Forensic Audit was not independent, but was instead constructed and directed by Defendants Briscoe and Ribi and Attorney Naylor to render proof of the allegations that Ms. Hammer had performed acts of financial mismanagement, in order to defend Defendants' otherwise retaliatory acts against Ms. Hammer.

280.    Upon information and belief, the Forensic Audit was designed to ignore any investigation of City Treasurer Frostenson's handling or presentation of financial transactions and information related thereto, or the City Council's approval of City Treasurer Frostenson's financial statements.

281.    Upon information and belief, during the course of the Forensic Audit, City records relevant to the allegations of misconduct against Ms. Hammer, and within the scope of the Forensic Audit, were destroyed by City Treasurer Frostenson, Deputy City Clerk Julia Kinsey-Lovey, and/or City firefighter Mal Prior, under the direction and supervision of Interim Executive Assistant Virginia Egger and/or Defendants.

282.    Upon information and belief, during the course of the Forensic Audit, City records related to the approval of expenses charged to City-issued credit cards, which were relevant to the allegations of misconduct against Ms. Hammer and within the scope of the Forensic Audit, were destroyed by City Treasurer Frostenson and/or other City officials and replaced with documents upon which Ms. Hammer's initials were forged.

283.    On or about February 3, 2012, Defendant Briscoe stated to the *Idaho Mountain Express* reporter that:   "The independent city auditor ... are also investigating financial and administrative issues in the city ....   They discovered unacceptable findings last year and made requests that the city correct issues but were ignored by [former Mayor] Willich and [former City Administrator Sharon] Hammer.   The same issues are now under investigation."   Defendant Briscoe also told the reporter that "the audit is on hold pending investigation by the attorney general's office and the Blaine County prosecutor's [sic] office for possible criminal conduct."   And, that:  "Hammer, although terminated, is still subject to the investigation."

284.    These statements by Defendant Briscoe implied that Ms. Hammer engaged in financial misconduct and criminal conduct as City Administrator.

285.    In or about June 2012, Defendant Briscoe instructed and/or authorized the City to publish at least two press releases regarding ICRMP's settlement of the tort claims against the City by City Clerk Ek and City Treasurer Frostenson.   Each press release implied that

Ms. Hammer had engaged in harassing activities against City Clerk Ek and City Treasurer Frostenson.  Neither press release advised that the tort claims had been settled without any involvement or approval by Ms. Hammer.

286.    Thereafter, numerous articles were published by the *Idaho Mountain Express* regarding the settlements of City Clerk Ek's and City Treasurer Frostenson's tort claims that incorporated quotes by Defendants Briscoe and Ribi and other City representatives.

287.    On or about June 29, 2012, almost two months before the results of the Forensic Audit were completed, Defendant Briscoe was quoted in the *Idaho Mountain Express* as stating: "I believe that the majority of both [tort] claims will be substantiated by the forensic audit."

288.    Upon information and belief, neither City Clerk Ek's nor City Treasurer Frostenson's allegations that Ms. Hammer engaged in harassing acts against them were part of the scope of the Forensic Audit.

289.    On or about August 8, 2012, weeks prior to the Forensic Audit being completed, Defendant Briscoe was quoted in an *Idaho Mountain Express* article as stating:  "The forensic audit unveiled that Sun Valley was not in compliance with many federal and state labor laws." Defendant Briscoe's statement implied that Ms. Hammer engaged in financial misconduct during her employment as City Administrator.  No such findings exist within the Forensic Audit.

290.    Also on August 8, 2012, the *Idaho Mountain Express* reported that, according to Defendant Briscoe:  "Once the complete results of the forensic audit are available, the city will turn over any alleged criminal matters to the Blaine County Prosecutor Jim Thomas and Chief Investigator for the Idaho Attorney General Scott Birch."   Defendant Briscoe's statement insinuated that Ms. Hammer had committed crimes during her employment as City Administrator.

291.    On or about August 23, 2012, the Forensic Auditors completed their Forensic Audit and issued a written report of the findings ("Forensic Audit Report").  The Forensic Audit Report relies heavily on the Unauthorized Ball Report.

292.    At no time before or after issuance of the Forensic Audit Report was Ms. Hammer given the opportunity to review the findings, respond to the findings, or appeal any findings within the Forensic Audit Report.  Ms. Hammer did, however, offer to be interviewed if she was provided with the documents being inquired about prior to the interview.

293.    The Forensic Audit Report is replete with factual errors and misstatements.

294.    On or about October 15, 2012, the Idaho Attorney General's office issued its own report related to the investigation against Ms. Hammer that had been requested by the Blaine County Prosecutor's Office ("AG Report").  The AG Report incorporates and relies upon both the Unauthorized Ball Report and the Forensic Audit Report.

295.    The AG Report is replete with factual errors and misstatements.

296.    On or about November 21, 2012, the Blaine County Prosecuting Attorney issued its findings related to the criminal investigation of employee misconduct ("Prosecutor's Report").  Therein, the Prosecutor conclusively found that there was no probable cause to charge Ms. Hammer with any criminal charges, as had been publically asserted by Defendants Briscoe and Ribi and Attorney Naylor.

297.    The Prosecutor's Report incorporated and relied on the Unauthorized Ball Report, the Forensic Audit Report, and the AG Report.

298.    The Prosecutor's Report makes erroneous conclusions based on the factual errors and statements contained in the Unauthorized Ball Report, the Forensic Audit Report, and the AG Report.

299.    At no time before or after issuance of the Prosecutor's Report was Ms. Hammer interviewed, given the opportunity to review the findings, respond to the findings, or appeal any findings therein.

300.    Following the determination in the Prosecutor's Report that there was no probable cause to charge Ms. Hammer with any criminal charges, Defendants have continued to publicly denigrate Ms. Hammer, in part by releasing the Unauthorized Ball Report, the Forensic Audit Report, the AG Report, and the Prosecutor's Report to the public.  Each report was provided to the *Idaho Mountain Express* and published on its website.

301.    Prior to the provision of each report to the *Idaho Mountain Express*, Ms. Hammer and/or Mr. Donoval had repeatedly requested copies of all such reports, and had repeatedly been refused a copy of each report on the asserted grounds that they were confidential documents.

302.    The Defendant City released a summary of the audit to the *Idaho Mountain Express* and in response to the *Idaho Mountain Express*'s November 30, 2012 article regarding the same, City Treasurer Frostenson published the following:

> To the residents of Sun Valley and Jim Donoval- during the forensic audit, it became quite obvious to me that I should have gone forward and whistle blown sooner.  I was embarrassed at what they found and the fact that yes, indeed, I did sign off on those expenditures.  You see, I made the grave mistake of trusting individuals whom I should not have trusted.  It broke my heart when I saw the gravity of the abuse and the fact that I did not see it myself.  I failed the residents of Sun Valley and for that, I am truly sorry.  I was aware that employees were taking liberties in their vacation reporting and I was also aware that some employees were also abusing their right to use City property for personal use.  I brought this to the attention of the appropriate person in authority repeatedly, but nothing was ever done to correct the abuse.  When I made the very difficult decision to go to the council with my concerns, I knew I would sacrifice my career to do the right thing. I chose to do it anyway.  I was under the same scrutiny as every other employee of the City during the audit and I was not found to have stolen any vacation or abuse my own City credit card in any

COMPLAINT AND DEMAND FOR JURY TRIAL – 55

way.  Michelle Frostenson, Former Treasurer, City of Sun Valley.

303.   On January 16, 2012, the Defendant City issued the following press release:

The day after a contested court hearing, including motions to stop Plaintiffs harassing discovery requests and sanction Attorney James Donoval, Sharon Hammer voluntarily dismissed her lawsuit against the City of Sun Valley, Councilman Nils Ribi, City Attorney Adam King and Councilman Robert Youngman. Ms. Hammer's two other lawsuits against the City of Sun Valley are still active.

City of Sun Valley officials are glad to see that this unfounded lawsuit has been dismissed.  While their counsel, Kirtlan Naylor, communicated all settlement offers by Ms. Hammer to the City, this resolution of a voluntary dismissal by Hammer is the appropriate action.

At no time did the City's Insurer, ICRMP, threaten that legal counsel or insurance coverage for the City was in jeopardy, contrary to allegations by Hammer.

Mr. Naylor stated in court at the hearing, held January 11, that the City's Investigative report, which has been the subject of much discussion in the news and court filings, has been turned over to the Blaine County Prosecuting Attorney for an Independent review of possible criminal conduct.  For that reason, it cannot be released for public consideration at this time.

The City of Sun Valley appreciates the patience of its citizens as appropriate steps are taken in this matter.  Mayor Briscoe is committed to ensuring a strong and effective administration to conduct the business of the City.  The dismissal of this lawsuit will allow the administration to now focus on the governing of the City and providing appropriate services to the citizens of Sun Valley.

304.   On January 18, 2012, Defendant Ribi posted the following on his blog:

I want to thank all of my friends and supporters who stood by me during these rather difficult past two months.  The dismissal of the Sharon Hammer lawsuit and the investigative report that has cleared me of the accusations raised by Ms. Hammer are clear affirmations of the fact that I never harassed or threatened anyone in my role as city councilman.  I was asked by two Sun Valley City officials to bring before the council evidence of questionable practices by Ms. Hammer and I did so.  The charges made against

me were an obvious smoke screen designed to divert attention from legitimate inquiry into certain financial practices at city hall during the last administration.  I don't doubt that the chicanery and wild antics of Ms. Hammer and her husband will continue for some time to come but I am pleased that the public will soon have an opportunity to judge Ms. Hammer's conduct for themselves.

305.    Regardless of the City's January 19, 2012 stated reason for termination of Ms. Hammer as being "without cause," the subsequent repeated public statements of the City, Defendants Briscoe and Ribi, and other City representatives show that her termination was actually for "cause."  Defendants have repeatedly and continuously retaliated against Plaintiffs by way of each of the investigations into allegations of misconduct by Ms. Hammer, the repeated public statements alleging criminal conduct by Ms. Hammer, and the settlement of City Clerk Ek's and City Treasurer Frostenson's tort claims without knowledge or approval of Ms. Hammer.

306.    Defendants City and Briscoe's public statements have had a deleterious and harmful affect on Ms. Hammer's personal and professional reputation and her ability to obtain municipal employment.

307.    Before and after Ms. Hammer's termination, Defendant Ribi did, and continues to, maintain a website and a blog, both of which recount and discuss allegations of misconduct, criminal conduct, and/or harassment of other City employees by Ms. Hammer.  Content within Defendant Ribi's website and blog implies that Ms. Hammer was guilty of the alleged misconduct.

308.    Defendant Ribi's public statements have had a deleterious and harmful affect on Ms. Hammer's personal and professional reputation and her ability to obtain municipal employment.

309.    Following her January 19, 2012 termination, Ms. Hammer actively sought

replacement employment with different municipal employers throughout the country, but was rejected from at least four municipal employment opportunities for which she was qualified. During each application process, the prospective employer inquired about the large amount of negative public comments published by Defendants regarding the circumstances of Ms. Hammer's termination.

310.    At all times relevant hereto, Defendants were acting under the color of state law.

311.    Some or all of Defendants' acts or omissions alleged herein occurred within the scope of their policymaking authority and constitute policies or customs of a local government unit.

312.    Some or all of Defendant Ribi's and Defendant Briscoe's acts or omissions involved malice and/or reckless and callous indifference to Plaintiffs' protected rights.

313.    Defendants' wrongful acts have damaged Plaintiffs, for which they are entitled to compensation.

## COUNT I

### GENDER DISCRIMINATION AND HARASSMENT
**Idaho Civil Rights Act, Idaho Code §§ 67-5901, *et seq.*
Defendant City of Sun Valley**

314.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

315.    The City employs five or more employees for each working day in each twenty or more calendar weeks in the calendar year.

316.    Ms. Hammer was employed by the City from on or about June 1, 2008 until January 19, 2012.

317.    Defendant Ribi, as a City Councilmember, created, promoted, and subjected

Ms. Hammer to a hostile work environment by subjecting her to unwelcomed, offensive, and intimidating conduct because of her sex as a female.

318.    The actions of Defendant Ribi created a workplace environment within the City that was permeated with discriminatory intimidation, ridicule, and insult severe and pervasive enough to alter the terms and conditions of Ms. Hammer's employment and to create a hostile and abusive working environment.

319.    The actions of Defendant Ribi constituted intentional, willful, reckless, and/or malicious violations of Idaho Code § 67-5909(1).

320.    Defendants' wrongful acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by Idaho Code § 67-5908, including attorney fees and costs, in amounts to be determined at trial.

321.    Defendants' acts are extreme deviations from reasonable standards of conduct and were done with an extremely harmful state of mind.  Plaintiff Hammer reserves the right to seek leave of Court to amend her Complaint to add a claim for punitive damages.

## COUNT II

### RETALIATION
### Idaho Civil Rights Act, Idaho Code §§ 67-5901, *et seq.*
### Defendant City of Sun Valley

322.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

323.    The City employs five or more employees for each working day in each twenty or more calendar weeks in the calendar year.

324.    Ms. Hammer was employed by the City from on or about June 1, 2008 until January 19, 2012.

325.    Defendants intentionally, willfully, recklessly and maliciously retaliated against Ms. Hammer because she opposed the discrimination and harassment to which she was subjected by Defendant Ribi because of her sex as a female when she made both written and verbal complaints and charges of such discrimination and harassment.

326.    Defendants retaliated against Ms. Hammer by placing her on administrative leave from November 18, 2011 through December 23, 2011.

327.    Defendants retaliated against Ms. Hammer by placing her on administrative leave beginning on January 4, 2012.

328.    Defendants retaliated against Ms. Hammer by terminating her employment with the City on January 19, 2012.

329.    Defendants further retaliated against Ms. Hammer by publishing multiple unfounded public statements that have had a deleterious and harmful affect on Ms. Hammer's personal and professional reputation.

330.    Defendants' acts were intentional, willful, reckless, and/or malicious violations of Idaho Code § 67-5911.

331.    Defendants' violations of Idaho Code § 67-5911 are the direct and proximate cause of the damages sustained by Ms. Hammer, including but not limited to pecuniary and nonpecuniary damages and all other relief allowed by Idaho Code § 67-5908, including attorney fees and costs.

332.    Defendants' acts are extreme deviations from reasonable standards of conduct and were done with an extremely harmful state of mind.  Plaintiff Hammer reserves the right to seek leave of Court to amend her Complaint to add a claim for punitive damages.

## COUNT III

### RETALIATION AGAINST MS. HAMMER IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENT RIGHTS TO FREEDOM OF SPEECH
### Defendants City of Sun Valley, Ribi, and Briscoe

333. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

334. Defendants unlawfully and intentionally retaliated against Ms. Hammer by, *inter alia*, twice placing her on administrative leave; collecting and disseminating confidential personnel documents of hers; asserting and repeatedly investigating nondescript and unsupported allegations of misconduct and criminal conduct against her; disallowing Ms. Hammer the opportunity to refute such allegations of misconduct and criminal conduct; terminating her position of employment as City Administrator; and repeatedly making public statements that had a deleterious and harmful affect on Ms. Hammer's personal and professional reputation.

335. Ms. Hammer suffered adverse employment actions when she, *inter alia*, was twice placed on administrative leave; had her confidential personnel documents distributed to unauthorized recipients; was not allowed to defend herself against nondescript and unsupported allegations of misconduct and criminal conduct against her; was terminated from her position of employment as City Administrator; and had numerous public statements made about her by Defendants that were deleterious and harmful to her personal and professional reputation.

336. The adverse employment actions taken against Ms. Hammer also constitute a threat of dismissal from public employment that will reasonably inhibit others' speech against acts of harassment made in violation of the Personnel Manual.

337. The adverse employment actions taken against Ms. Hammer would chill the speech of a person with ordinary firmness.

338.    Ms. Hammer's speech, *inter alia*, informing the City of Defendant Ribi's ongoing harassment of her, requesting enforcement of the City's harassment policy, and requesting requisite protection by the City against Defendant Ribi's harassment of her as a City employee, was a matter of legitimate public concern.  Further, because Defendant Ribi is an elected official, Ms. Hammer's claims of misconduct against him were a matter of legitimate public concern.

339.    Ms. Hammer's speech, *inter alia*, informing the City of Defendant Ribi's ongoing harassment of her, requesting enforcement of the City's harassment policy, and requesting requisite protection by the City against Defendant Ribi's harassment of her as a City employee, was a substantial motivating factor for the series of acts by City Clerk Ek, City Treasurer Frostenson, City Attorney King, Defendant Briscoe, Investigator Ball, Attorney Naylor, and other City representatives that were commenced by Defendant Ribi and that resulted in adverse employment actions being taken against Ms. Hammer.

340.    Defendants knew or reasonably should have known that by, *inter alia*, securing confidential documents of Ms. Hammer's or related to Ms. Hammer's duties as City Administrator, which they could misinterpret to others as allegedly evidencing misconduct or criminal conduct by Ms. Hammer, would succeed in having her terminated from her position as City Administrator and investigated by various authorities.

341.    Defendants violated Ms. Hammer's First Amendment rights by retaliating against her for criticizing Defendant Ribi and for, *inter alia*, informing the City of Defendant Ribi's ongoing harassment of her, requesting enforcement of the City's harassment policy, and requesting requisite protection by the City against Defendant Ribi's harassment of her as a City employee.

342.    Defendants would not have engaged in such conduct but for their retaliatory

motives.

343.    Defendants had final policymaking authority over the conduct and employment actions taken against Ms. Hammer, as alleged herein.

344.    Defendants' actions of retaliation against Ms. Hammer for complaining about and criticizing Defendant Ribi were violative of the guarantees contained in the First and Fourteenth Amendments.

345.    Defendants' wrongful acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs, and a name-clearing hearing.

346.    Some or all of the foregoing acts and/or omissions by Defendant Ribi and Defendant Briscoe were done outside of the course and scope of their employment and with malice or with reckless disregard of Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is also entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT IV

### RETALIATION AGAINST MS. HAMMER IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENT RIGHTS OF ACCESS TO THE COURTS
### Defendants Sun Valley, Ribi, and Briscoe

347.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

348.    On or about November 21, 2011, Ms. Hammer filed her IPPEA Case and her IHRC Complaint.

349.    Subsequent to November 21, 2011, Defendants and other City representatives were aware of the pendency of the IPPEA Case and the IHRC Complaint.

350.    Ms. Hammer's right to file the IPPEA Case and the IHRC Complaint were

protected speech, providing Ms. Hammer with rights and protections against retaliation by Defendants.

351.     The Defendants engaged in at least the following acts of:

a.   Collecting and disseminating confidential personnel documents and information related to Ms. Hammer;

b.   Alleging nondescript and unsupported allegations of misconduct and criminal conduct against Ms. Hammer;

c.   Placing Ms. Hammer on administrative leave a second time subsequent to Defendant Briscoe becoming Mayor of the City;

d.   Instituting repeated investigations of Ms. Hammer for such allegations;

e.   Terminating Ms. Hammer's position of employment as City Administrator; and

f.   Publishing multiple unfounded public statements asserting criminal and other misconduct by Ms. Hammer, all of which were done in retaliation against Ms. Hammer for having filed her IPPEA Case and her IHRC Complaint.

352.     On January 19, 2012, Defendants terminated Ms. Hammer's employment as City Administrator in large part because Ms. Hammer had filed pleadings with the Blaine County District Court and the IHRC.

353.     Ms. Hammer suffered adverse employment actions when she was, *inter alia*, placed on administrative leave a second time, and terminated from her position of employment as City Administrator.

354.     The adverse employment actions taken against Ms. Hammer also constitute a threat of dismissal from public employment that would and will reasonably inhibit others' right

to seek redress from courts against the City and City representatives.

355.   The adverse employment actions taken against Ms. Hammer would chill the speech of a person with ordinary firmness.

356.   Defendants violated Ms. Hammer's First Amendment rights to access to the courts by retaliating against her, as a City employee, for filing the IPPEA Case and the IHRC Complaint.

357.   Defendants would not have engaged in such conduct but for their retaliatory motives.

358.   Defendants had final policymaking authority over the City's conduct and employment actions taken against Ms. Hammer, as alleged herein.

359.   Defendants' actions of retaliation against Ms. Hammer for filing the IPPEA Case and the IHRC Complaint violated the guarantees contained in the First and Fourteenth Amendments and made applicable to the States and the City by reason of the Due Process Clause of the Fourteenth Amendment.

360.   Defendants' wrongful acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs, and a name-clearing hearing.

361.   Some or all of the foregoing acts and/or omissions by Defendant Briscoe and Defendant Ribi were done outside of the course and scope of their duties as City officials and with malice or with reckless disregard for Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is also entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

<u>COUNT V</u>

**RETALIATORY INVESTIGATION AGAINST MS. HAMMER
IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)
Defendants Sun Valley, Ribi, and Briscoe**

362.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

363.    On or about December 13, 2011, Mayor Willich concluded the internal investigation conducted by Investigator Ball.  Mayor Willich determined that Ms. Hammer had not violated any City policies, as asserted by Defendant Ribi and City Treasurer Frostenson.

364.    Thereafter, Mayor Willich informed Ms. Hammer, in writing, that he had conclusively determined that she had done nothing requiring discipline or further investigation, and that he had closed any further investigations related to Ms. Hammer.

365.    After Mayor Willich had concluded the internal investigation, and without the knowledge or approval of Mayor Willich, Defendants Ribi and Briscoe, Investigator Ball, and Attorney Naylor commenced or continued a scheme to further investigate Ms. Hammer for the purpose of proving that she had engaged in misconduct and criminal activities ("Criminal Investigation Scheme").

366.    Defendants Ribi and Briscoe and Attorney Naylor sought to further investigate Ms. Hammer in retaliation against her for having brought forward the allegations of harassment and misconduct against Defendant Ribi, for filing the IPPEA Case and the IHRC Complaint, and for her intimate association with Mr. Donoval.

367.    In furtherance of the Criminal Investigation Scheme, Defendants Briscoe and Ribi and Attorney Naylor sought the assistance and guidance of other individuals, including but not limited to City Attorney King, City Treasurer Frostenson, City firefighter Mal Prior, Investigator

Ball, and Blaine County Prosecutor Jim J. Thomas.

368.    In furtherance of the Criminal Investigation Scheme, Investigator Ball completed the Unauthorized Ball Report at the direction of Defendants Briscoe and Ribi and Attorney Naylor.

369.    Mayor Willich never authorized the preparation of the Unauthorized Ball Report, nor did Investigator Ball ever provide Mayor Willich with a copy of the Unauthorized Ball Report.

370.    Contrary to Investigator Ball's limited scope of fact-finding authority as stated in the Ball Retainer Agreement, the Unauthorized Ball Report contained unauthorized interpretations of the Personnel Manual and conclusory opinions regarding the findings of fact obtained by Investigator Ball during the internal investigation.

371.    The Unauthorized Ball Report was prepared by Investigator Ball for the purpose of presenting it for incorporation and reference into other anticipated investigations, such as the Forensic Audit, and to eventually be utilized by the Blaine County Prosecutor's Office.

372.    In or about December 2012, prior to the end of Mayor Willich's term, Attorney Naylor contacted the Blaine County Prosecutor's Office, without Mayor Willich's express authorization, and requested that an investigation regarding allegations of Ms. Hammer's misconduct and criminal conduct be commenced and be based upon the unauthorized conclusions of Investigator Ball.

373.    On information and belief, with the knowledge and direction of Defendant Briscoe, Defendant Ribi, and Attorney Naylor, and in furtherance of the Criminal Investigation Scheme, certain City documents which would have been exculpatory to any criminal allegations against Ms. Hammer were purposefully destroyed, replaced with forged documents, or not

turned over to Investigator Ball, the Forensic Auditors, the Attorney General's Office, or the Blaine County Prosecutor's Office by City officials, including but not limited to:  Ms. Hammer's Contract; the exculpatory evidence presented to Investigator Ball at the November 29, 2011 interview between Ms. Hammer and Investigator Ball; the Personnel Manual; the City Treasurer Job Description; the City documents and correspondences confirming that City Treasurer Frostenson was solely responsible for all City financial transactions; and the original expenditure documents confirming that City Treasurer Frostenson had sworn under oath as to the legitimacy of all financial transactions related to Ms. Hammer and that the City Council itself had approved all financial transactions that Ms. Hammer was now being retroactively accused of misconduct in relation to.

374.    At the time the Unauthorized Ball Report was prepared and turned over to the Forensic Auditors, the Attorney General's Office, and the Blaine County Prosecutor's Office, Defendants knew or should have known that there was no probable cause for Ms. Hammer to be charged with any criminal violations.

375.    On or about November 21, 2012, Blaine County Prosecutor Jim Thomas issued his Prosecutor's Report, conclusively determining that no probable cause existed to charge Ms. Hammer with any criminal charges.

376.    Defendants violated Ms. Hammer's First Amendment rights through the Criminal Investigation Scheme and by retaliating against her for criticizing Defendant Ribi and for, *inter alia*, informing the City of Defendant Ribi's ongoing harassment of her, requesting enforcement of the City's harassment policy, requesting requisite protection by the City against Defendant Ribi's harassment of her as a City employee, seeking legal redress in the Blaine County District Court and the IHRC, and for her intimate association with Mr. Donoval.

377.     Defendants would not have engaged in such conduct but for their retaliatory motives.

378.     Defendants' retaliatory acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs.

379.     Some or all of the foregoing acts and/or omissions by Defendant Briscoe and Defendant Ribi were done outside of the course and scope of their duties as officials of the City and with malice or with reckless disregard for Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT VI

### RETALIATION AGAINST MR. DONOVAL AND MS. HAMMER IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENT RIGHTS TO INTIMATE AND POLITICAL ASSOCIATION
### Defendants Sun Valley, Ribi, and Briscoe

380.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

381.     Beginning in or about the summer of 2010, Mr. Donoval announced that he would run for the Idaho Senate as a Republican.

382.     Thereafter, Defendant Ribi became hostile toward Mr. Donoval and Ms. Hammer, in part because Mr. Donoval had criticized Defendant Ribi for publicly endorsing Mr. Donoval's opponent in the Idaho Senate election.

383.     Also in or about the summer of 2010, Defendant Ribi became increasingly hostile toward Mr. Donoval and Ms. Hammer because of Mr. Donoval's personal friendship with Mayor Willich.

384.     Subsequent to the November 11, 2011 City Council Special Executive Session,

Defendants became more hostile toward Mr. Donoval and Ms. Hammer because of Mr. Donoval's November 12, 2011 letter, disclosing that he was representing Ms. Hammer in matters related to the City, and that the City was obligated to protect Ms. Hammer from Defendant Ribi's ongoing harassment and abusive conduct.

385.    Defendants became further hostile toward Mr. Donoval and Ms. Hammer because of Mr. Donoval's November 16, 2011 letter, disclosing that Ms. Hammer would sue the City and various City representatives if the City did not take immediate remedial action regarding the allegations of misconduct against Ms. Hammer and the allegations of harassment and abusive conduct toward Ms. Hammer by Defendant Ribi.

386.    Defendants' actions in seeking to investigate Ms. Hammer and to place her on administrative leave on or about November 18, 2011, were motivated, in large part, because of their hostility and contempt for Mr. Donoval.

387.    Between November 18, 2011 and December 12, 2011, Mr. Donoval filed his public records request with the City and the Public Records Case with the Blaine County District Court, which further infuriated Defendants.

388.    Between November 21, 2011 and December 15, 2011, as counsel for Ms. Hammer, Mr. Donoval filed the IPPEA Case and the IHRC Complaint, which further infuriated Defendants.

389.    Immediately following the filing of the IPPEA Case, the City, by and through Defendant Ribi, made public statements in the *Idaho Mountain Express* newspaper insinuating that neither the IPPEA Case nor Mr. Donoval were credible.

390.    As evidence of Defendant Ribi's contempt for Mr. Donoval, on December 30, 2011, Defendant Ribi, as an individual, filed a defamation lawsuit against Mr. Donoval, claiming

that Mr. Donoval had no right to include allegations related to Defendant Ribi's emotional wellbeing or mental stability within the IPPEA Case and the IHRC Complaint.

391.    Defendant Ribi's defamation lawsuit was dismissed through summary judgment due to Mr. Donoval's privilege as an attorney representing Ms. Hammer.

392.    Throughout December 2011 and January 2012, Defendants engaged in acts in furtherance of their Criminal Investigation Scheme.

393.    On January 4, 2012, Defendant Briscoe placed Ms. Hammer on administrative leave for the second time.

394.    On January 19, 2012, Defendant Briscoe recommended the termination of Ms. Hammer to the City Council and succeeded in receiving a majority vote of the City Council.

395.    The adverse employment acts taken by Defendants against Ms. Hammer of twice placing her on administrative leave, terminating her from her employment, repeatedly investigating her, and forcing her to endure numerous false incriminating and defamatory public statements against her by City representatives were, in part, related to Defendants' disdain for Mr. Donoval.

396.    Both Mr. Donoval and Ms. Hammer have a federally protected right to intimate association between husband and wife, legal counsel of their choice, and political association with their chosen political party.

397.    Defendants would not have engaged in such conduct but for their retaliatory motives relating to Ms. Hammer's association with Mr. Donoval.

398.    Because of Defendants' retaliatory termination and other retaliatory acts against Ms. Hammer, both Ms. Hammer and Mr. Donoval have suffered economic and noneconomic losses, including but not limited to emotional pain and suffering, embarrassment, mental anguish,

and the need to move away from the City of Sun Valley in order to find alternative gainful employment.

399.    Some or all of the foregoing acts and/or omissions by Defendants Briscoe and Ribi were done outside of the course and scope of their duties as officials of the City and with malice or reckless disregard for Ms. Hammer's and Mr. Donoval's constitutional rights, and therefore Plaintiffs are entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

<u>**COUNT VII**</u>

**DEPRIVATION OF PROPERTY IN VIOLATION OF THE
FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION (42 U.S.C. § 1983)
Defendants Sun Valley, Ribi, and Briscoe**

400.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

401.    Ms. Hammer held a property interest in her continuing employment as the City Administrator for the City of Sun Valley.

402.    Defendants terminated Ms. Hammer from the position under the guise of said termination being "without cause."  Yet, subsequent statements of Defendants and other City representatives show that Ms. Hammer was in fact terminated for "cause."

403.    Ms. Hammer was entitled to due process prior to her termination.

404.    Ms. Hammer made a written request to Defendants for due process, which was refused.

405.    Defendants acted without any reasonable basis in fact or in law in terminating Ms. Hammer's employment.  Defendants' acts resulted in a deprivation of Ms. Hammer's property rights protected by the Fifth and Fourteenth Amendments to the United States Constitution.

406.    Defendants' wrongful acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs.

407.    Some or all of the foregoing acts and/or omissions by Defendant Briscoe and Defendant Ribi were done outside of the course and scope of their duties as City officials and with malice or with reckless disregard for Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is also entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT VIII

### UNCONSTITUTIONAL BIAS DEPRIVATION OF PROPERTY IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) Defendants Sun Valley, Ribi, and Briscoe

408.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

409.    Ms. Hammer held a property interest in her continuing employment as the City Administrator for the City of Sun Valley.

410.    Ms. Hammer was denied her constitutional right to notice and a fair hearing before an impartial tribunal.

411.    Defendants prejudged, or reasonably appeared to have prejudged, issues relating to Ms. Hammer's repeated complaints of harassment by Defendant Ribi and the accuracy and/or occurrence of alleged acts of misconduct or criminal conduct by Ms. Hammer, including, *inter alia*, that:

a.  Defendant Ribi could not be penalized for his continuous harassment and abuse of Ms. Hammer because of his elected position;

b.  The City's harassment policy was inapplicable to the harassing and abusive

COMPLAINT AND DEMAND FOR JURY TRIAL – 73

acts by Defendant Ribi against Ms. Hammer;

c.   The City did not have the authority or the obligation to protect Ms. Hammer against the harassment of Defendant Ribi;

d.   Ms. Hammer had complete supervisory authority over City Treasurer Frostenson, regardless of City Treasurer Frostenson's independent duty to report to the City Council and for the City Council to approve all financial activities reported by City Treasurer Frostenson;

e.   Ms. Hammer had acted without authorization in using a 2001 Ford Expedition owned by the City for any and all purposes, including for personal use;

f.   Ms. Hammer had acted without authorization in using and charging amounts to a City credit card for any and all gasoline purchases related to the 2001 Ford Expedition; and

g.   Ms. Hammer had acted without authorization in taking compensatory time off during a normal work week without using accrued vacation time in order to offset the substantial non-regular work hours Ms. Hammer committed to the City between her positions as City Administrator and City firefighter and EMT.

412.   Defendants acted with actual bias against Ms. Hammer because, *inter alia*:

a.   Ms. Hammer had made multiple charges of harassment and abuse against Defendant Ribi, to which the City did not adequately respond;

b.   All Defendants sought Ms. Hammer's resignation following the November 11, 2011 Executive Session;

c.   Ms. Hammer named the City and Defendant Ribi as defendants in the IPPEA Case;

d.   Ms. Hammer named the City and Defendant Ribi as defendants in the IHRC

Complaint;

    e.   All Defendants participated in the termination of Ms. Hammer; and

    f.   All Defendants made multiple post-termination comments expressly stating and/or insinuating that Ms. Hammer had engaged in misconduct and/or criminal conduct.

413.   Defendants acted with the appearance of partiality against Ms. Hammer because, *inter alia*:

    a.   Ms. Hammer had made multiple charges of harassment and abuse against Defendant Ribi, to which the City did not adequately respond;

    b.   Defendants disregarded the findings of Mayor Willich, following his receipt and review of the Authorized Ball Report, that Ms. Hammer had not committed any type of misconduct as City Administrator;

    c.   Defendants disregarded Ms. Hammer's requests that City Attorney King recuse himself from representation in the IPPEA Case because of the apparent conflict created by City Attorney King previously providing legal counsel to Ms. Hammer regarding Defendant Ribi; and

    d.   Defendants refused to give Ms. Hammer notice of the allegations of misconduct that Defendant Ribi and other City representatives had lodged against her.

414.   Defendant Ribi imparted his views and bias onto his colleagues, thereby influencing at least Defendant Briscoe, Mayor Willich, Councilman Youngman, Councilman Suhadolnik, and Councilwoman Griffith in the decisions to place Ms. Hammer on administrative leave, repeatedly investigate Ms. Hammer, and terminate Ms. Hammer's employment.

415.   Defendants acted in an arbitrary and improper manner.

416.   Defendants' wrongful acts have resulted in Ms. Hammer's injury, including

pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs.

417.   Some or all of the foregoing acts and/or omissions by Defendant Briscoe and Defendant Ribi were done outside of the course and scope of their duties as City officials and with malice or with reckless disregard for Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is also entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT IX

**DEPRIVATION OF DUE PROCESS IN VIOLATION OF THE FIRST, FIFTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) – STIGMA PLUS**
**Defendants Sun Valley, Ribi, and Briscoe**

418.   Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs any by reference incorporate each paragraph herein.

419.   On January 19, 2012, Ms. Hammer was terminated from her employment as City Administrator.

420.   Defendants made stigmatizing and/or substantially false statements regarding or relating to Ms. Hammer and/or her termination, including, *inter alia*, that:

a.   "Mayor [Willich] and Council had reason to believe that [Ms. Hammer] may have committed serious misconduct, including possible criminal violations of statutes dealing with the misuse of public funds and falsification of public records by [Ms. Hammer]."

b.   As of January 11, 2012, Ms. Hammer was being investigated by the Blaine County Prosecutor for allegations of criminal conduct.

c.   By February 3, 2012, "The independent city auditor ... are also investigating financial and administrative issues in the city ... . *They discovered unacceptable findings last year and made requests that the city correct issues but were ignored by [former Mayor Wayne]*

*Willich and [former City Administrator Sharon] Hammer.*   The same issues are now under investigation."   (Emphasis added.)   Defendant Briscoe also stated that "the audit is on hold pending investigation by the attorney general's office and the Blaine County prosecutor's [sic] office for possible criminal conduct."

       d.   Prior to June of 2012, Ms. Hammer had engaged in harassing activities against City Clerk Ek and City Treasurer Frostenson as alleged in their respective notices of tort claim.

       e.   On June 29, 2012, almost two months before the results of the Forensic Audit were completed, Defendant Briscoe "believe[d] that the majority of both [tort] claims will be substantiated by the forensic audit."

       f.   On August 8, 2012, weeks prior to the Forensic Audit being completed, "The forensic audit unveiled that Sun Valley was not in compliance with many federal and state labor laws."

       g.   Also on August 8, 2012, Defendants again insinuated that Ms. Hammer had committed crimes during her employment as City Administrator by stating:   "Once the complete results of the forensic audit are available, the city will turn over any alleged criminal matters to the Blaine County Prosecutor Jim Thomas and Chief Investigator for the Idaho Attorney General Scott Birch."

404.   All such statements were of a stigmatizing nature.

405.   All such statements attended to, or were made in connection with, Ms. Hammer's termination from her employment as Sun Valley City Administrator.

406.   All such statements were made publically through publication on the City's website, through the *Idaho Mountain Express* newspaper and/or website, and/or on Defendant Ribi's website and/or blog.

407.    All such statements were made by Defendant Briscoe or Defendant Ribi as representatives of the City, acting under the color of state law.

408.    All such statements were made without Ms. Hammer having a meaningful opportunity for a name-clearing hearing.

409.    All such statements have severely damaged Ms. Hammer's reputation, standing and associations in the community of Sun Valley, and have foreclosed Ms. Hammer's freedom to take advantage of other employment opportunities within the area of municipal government.

410.    All such statements have deprived Ms. Hammer of her constitutionally protected liberty and property rights.

411.    Defendants' wrongful acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs, and a name-clearing hearing.

412.    Some or all of the foregoing acts and/or omissions engaged in by Defendant Ribi and Defendant Briscoe were done outside of the course and scope of their employment and with malice or with reckless disregard for Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is also entitled to an award of punitive damages pursuant to 42 U.S.C. § 1983.

<u>COUNT X</u>

**VIOLATION OF MS. HAMMER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS (42 U.S.C. §§ 1983 and 1985) – CIVIL CONSPIRACY Defendants Sun Valley, Ribi, and Briscoe**

413.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

414.    Defendants Ribi and Briscoe, acting in concert with City Attorney King, City Clerk Ek, City Treasurer Frostenson, and other City representatives, constitute an association of

more than two people.

415.    Defendants agreed to, and in fact did, develop and carry out the unlawful objective of gathering confidential City documents regarding or relating to Ms. Hammer which, when intentionally misconstrued, would provide the appearance of alleged misconduct in order to have Ms. Hammer terminated from her position of employment as City Administrator, and to ruin her personal and professional reputation.

416.    Upon gathering such documents, convening regarding the same, and using such documents toward the termination of Ms. Hammer's employment, Defendants committed unlawful, overt acts in furtherance of the afore-alleged objectives and according to the planned manner in which they were to be achieved.

417.    Ms. Hammer was injured as a result of the Defendants' overt acts in furtherance of the afore-alleged objectives and according to the planned manner in which they were to be achieved.

418.    Defendants' actions in furtherance of the conspiracy were violative of the guarantees contained in the Fifth and Fourteenth Amendments to the United States Constitution. Defendants' wrongful acts have resulted in Ms. Hammer's injury, including pecuniary and nonpecuniary damages, and she is entitled to relief as allowed by 42 U.S.C. §§ 1983 and 1988, including attorney fees and costs.

419.    Some or all of the foregoing acts and/or omissions by Defendant Ribi and Defendant Briscoe were done outside of the course and scope of their employment and with malice or with reckless disregard for Ms. Hammer's constitutional rights, and therefore Plaintiff Hammer is entitled to an award of punitive damages pursuant to 42 U.S.C. §§ 1983 and 1985.

## COUNT XI

### ASSAULT AGAINST MS. HAMMER
### Defendant Ribi, in his individual capacity

420.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

421.     On September 15, 2011, Defendant Ribi acted intending to cause a harmful or offensive contact, or an immediate fear of such contact, with the person of Ms. Hammer,.

422.     As a result of Defendant Ribi's act, Ms. Hammer feared that such harmful or offensive contact with her person was imminent.

423.     As a result of Defendant Ribi's act, Ms. Hammer was injured and is entitled to damages as awarded at the trial in this matter.

424.     Plaintiff Hammer reserves the right to  seek leave of Court to amend her Complaint to add a claim for punitive damages.

## COUNT XII

### WRONGFUL TERMINATION OF MS. HAMMER
### Defendants Sun Valley, Ribi, and Briscoe

425.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

426.     Ms. Hammer was employed by the City of Sun Valley.

427.     Ms. Hammer's termination from her employment by Defendants contravenes the public policy against harassment and discrimination because of Ms. Hammer's sex as a female.

428.     Ms. Hammer's termination from her employment contravenes the public policy against retaliation against employees who exercise their state and federal rights to file verbal and written complaints regarding acts of harassment and discrimination against them.

429.     Ms. Hammer's termination from her employment contravenes the public policy against retaliation against employees who exercise their state and federal rights of intimate association and political affiliation.

430.     Ms. Hammer's termination from her employment contravenes the public policy against discrimination and retaliation against employees who exercise their state and federal rights of freedom of speech.

431.     Ms. Hammer's termination from her employment was a wrongful termination that resulted in Ms. Hammer sustaining damages, including lost wages and benefits, front pay, emotional distress, and other damages to be proven at trial.

432.     Some or all of Defendant Ribi's and Defendant Briscoe's acts were reckless, willful and wanton conduct and were done with an extremely harmful state of mind, and therefore Plaintiff Hammer reserves the right to seek leave of Court to amend her Complaint to add a claim for punitive damages.

## COUNT XIII

### BREACH OF CONTRACT
### Defendants Sun Valley, Ribi, and Briscoe

433.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs any by reference incorporate each paragraph herein.

434.     From June 1, 2008 to January 19, 2012, Ms. Hammer was employed by the City as the City Administrator.

435.     At all times therein a valid and enforceable contract existed between Ms. Hammer and the City which set forth the terms and conditions of Ms. Hammer's employment as City Administrator.

436.     A covenant of good faith and fair dealing was an implied obligation of the

employment contract between Ms. Hammer and the City.

437.    On or about January 19, 2012, the City terminated Ms. Hammer's employment with the City.

438.    The City allegedly terminated Ms. Hammer "without cause" pursuant to Section 3.A of the written employment agreement.

439.    It was implicit in the employment agreement that if the City were to terminate Ms. Hammer "without cause," the City would not then make repeated public statements that Ms. Hammer had committed a crime or financial misconduct during her employment as City Administrator.

440.    It was implicit in the employment agreement that if the City were to terminate Ms. Hammer "without cause," the City would not then make repeated public statements insinuating that Ms. Hammer had committed a crime or financial misconduct, or harassed other City employees during her employment as City Administrator.

441.    It was implicit in the employment agreement that if the City were to terminate Ms. Hammer "without cause," the City would allow Ms. Hammer to continue on with her career within the field of municipal government without any negative implications.

442.    Instead, both before and after the City's termination of Ms. Hammer, the City made several public, stigmatizing, and substantially false statements that have severely damaged Ms. Hammer's reputation, standing and associations, thereby foreclosing Ms. Hammer's ability to take advantage of other employment opportunities within the area of municipal government.

443.    Following the January 19, 2012 termination of her employment with the City, Ms. Hammer actively sought replacement employment with different municipal employers throughout the country, but was rejected by at least four municipal employment opportunities for

which she qualified.  During each application process, the prospective employer inquired about the large number of negative public comments published by Defendants, and the circumstances of Ms. Hammer's termination from the City.

444.    Defendants took actions which violated, nullified, or significantly impaired any benefit of the employment contract in violation of the implied-in-law covenant of good faith and fair dealing of the employment agreement.

445.    Defendants did not perform in good faith the obligations imposed upon the City in the employment agreement.

446.    Ms. Hammer has been injured as a result of Defendants' breaches of contract, sustaining damages including lost wages and benefits, front pay, emotional distress, and other damages to be proven at trial.

447.    Some or all of Defendant Briscoe's and Defendant Ribi's acts were reckless, willful and wanton conduct and were done with an extremely harmful state of mind, and therefore Plaintiff Hammer reserves the right to seek leave of Court to amend her Complaint to add a claim for punitive damages.

## COUNT XIV

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST MS. HAMMER
### Defendants Ribi and Briscoe

448.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

449.    Defendants had a duty to conform to certain standards of conduct.

450.    Defendants breached their duty to conform to certain standards of conduct.

451.    The wrongful conduct by Defendants directly and proximately caused

Ms. Hammer emotional distress.

452. The emotional distress experienced by Ms. Hammer has been, and continues to be, severe, and has physically manifested itself.

453. Ms. Hammer has been injured and experienced actual loss or damage as a result of Defendants' wrongful conduct.

454. Defendants are liable for special and general damages to be proven at trial.

455. Some or all of Defendant Briscoe's and Defendant Ribi's acts were extreme and outrageous, reckless, willful or wanton conduct, and were done with an extremely harmful state of mind, and therefore Plaintiff Hammer reserves the right to seek leave of Court to amend her Complaint to add a claim for punitive damages.

## DAMAGES

456. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs and by reference incorporate each paragraph herein.

457. As a direct and proximate result of the unlawful acts of Defendants as described herein, Plaintiffs have been injured as follows, but not limited to:

a. Plaintiffs have been deprived of their constitutional rights guaranteed by the United States Constitution.

b. Plaintiffs have suffered discrimination, harassment, and/or retaliation as a result of acting upon protected activities under Idaho's Human Rights Act and their First Amendment freedoms of speech and association.

c. Plaintiff Hammer has suffered the loss of her property right in her chosen form of occupation as City Administrator of the City of Sun Valley.

d. Plaintiff Hammer has suffered the loss of her professional reputation and

future earning capacity.

   e. Plaintiffs have incurred monetary expenses due to the termination of each of the above losses of right or liberty.

   f. Plaintiffs have incurred, and will be required to incur in the future, legal fees and costs to protect their rights.

**ATTORNEY FEES AND COSTS**

  Plaintiffs have been forced to incur attorney fees and costs related to the prosecution of this matter.  Plaintiffs are entitled to recover their reasonable costs and attorney fees incurred in this matter pursuant to 42 U.S.C. §§ 1981a(b), 1983, and 1988, Idaho Code §§ 6-918A, 6-1604, 12-117, 12-120, 12-121, and/or 67-5908(3), Federal Rule of Civil Procedure 54, and/or other applicable law.

**DEMAND FOR JURY TRIAL**

  Plaintiffs demand a trial by jury in this action on all issues and all claims herein.

**PRAYER FOR RELIEF**

  **WHEREFORE**, Plaintiffs respectfully request judgment against Defendants, and each of them, as follows:

  1. For equitable and compensatory relief, including but not limited to back pay, interest on back pay, front pay, attorney fees, costs, and all other relief Plaintiffs are entitled to under 42 U.S.C. § 1981a(b), 42 U.S.C. § 1983, 42 U.S.C. § 1988, Idaho Code § 67-5908(3), Idaho Code § 6-1604, Idaho Code § 12-121, Federal Rule of Civil Procedure 54, and/or other applicable law;

  2. For special and general damages that fully and fairly compensate Plaintiffs for Defendants' wrongful acts complained of herein;

3.      For punitive damages based on Defendant Ribi's and Defendant Briscoe's willful violations of and callous indifference to Plaintiffs' constitutionally protected rights. Some or all of the acts, conduct, and behavior of Defendant Ribi and Defendant Briscoe were performed recklessly, willfully, wantonly, in bad faith, with improper motive, and with callous indifference to Plaintiffs' constitutional and other legal rights, by reason of which Plaintiffs are entitled to an award of punitive damages;

4.      For reasonable attorney fees and costs incurred in the prosecution of this action, or $15,000 should this matter proceed by default against any Defendant;

5.      For an award of pre-judgment and post-judgment interest as allowed by law; and

6.      For such other and further relief as the Court deems just and equitable, including the right to seek leave to amend to add a claim for punitive damages on Plaintiffs' state claims.

DATED this _____2ND_____ day of May, 2013.

JONES & SWARTZ PLLC

By _____
ERIC B. SWARTZ
JOY M. VEGA

## <u>VERIFICATION</u>

STATE OF IDAHO   )
                     : ss.
County of Ada      )

     I, SHARON R. HAMMER, being first duly sworn, depose and state that I am one of the Plaintiffs in the above-entitled action; that I have read the above and foregoing COMPLAINT AND DEMAND FOR JURY TRIAL; and that the facts therein stated are true and correct to the best of my knowledge, information and belief.

                                                  _____
                                                SHARON R. HAMMER

**SUBSCRIBED AND SWORN TO** before me this _2nd_ day of May, 2013.



                                     _Elisabeth E. Luchini_____
                                     Notary Public for Idaho
                                     My Commission expires: _07.13.2018_

## VERIFICATION

STATE OF IDAHO    )

                    : ss.

County of Ada      )

      I, JAMES R. DONOVAL, being first duly sworn, depose and state that I am one of the Plaintiffs in the above-entitled action; that I have read the above and foregoing COMPLAINT AND DEMAND FOR JURY TRIAL; and that the facts therein stated are true and correct to the best of my knowledge, information and belief.

_____

JAMES R. DONOVAL

      **SUBSCRIBED AND SWORN TO** before me this 2nd day of May, 2013.

_____

Notary Public for Idaho

My Commission expires: 07.13.2018

ELISABETH E. LUCHINI

NOTARY PUBLIC

STATE OF IDAHO